UNITED STATES ex rel. GUARANTY TRUST CO. OF NEW YORK v. HAGGERTY et al.

(Circuit Court, N. D. West Virginia. July 24, 1902.)

1. INJUNCTION—GROUNDS—COMBINATION TO INDUCE STRIKES.

The power of a court of equity may be invoked to restrain and inhibit by injunction a combination which is formed to induce employés who are not dissatisfied with the terms of their employment to strike for the purpose of inflicting injury and damage upon the employers.

2. SAME.

While employés have the right to quit their employment whenever they desire, unless contractual relations exist between them and their employers which should control such right, the action of third persons, having no interest in the contracts between workmen and their employers, in conspiring to control the action of the workmen and to induce them to strike by means of threats, intimidation, or a resort to any other modes usually employed in such cases, is an illegal and malicious interference with the employer's business, which a court of equity may properly enjoin where it is necessary to prevent irreparable injury.

3. SAME—VIOLATION—CONTEMPT OF COURT.

Defendants, who were alleged to be unlawfully interfering with the business of a coal company and its employés by attempting to incite the latter to strike, were enjoined from assembling together, in camp or otherwise, at or near the mines of the company, or at or so near the residences of its employés, as to disturb, alarm, or intimidate such employés, so as to prevent them from working in the mines, or to prevent or interfere with them in passing to or from their work at the mines, or in otherwise interfering with them as the employés of the company. After being served with the injunction, defendants assembled and held an open-air meeting within 1,000 feet from the opening of the mine, and within 300 to 400 feet from the residences of the miners, and in plain view of both. It was also near where the miners were obliged to pass in going to and from their work, and 150 feet from the company's property. At such meeting violent speeches were made by defendants, in which they stated that the injunction did not amount to anything, and would not stop them; that, if they were arrested, others would take their places; and they criticised the court for granting an injunction, stating that the judge was a tool of the company, and no attention should be paid to his order, but that the miners should be made to lay down their tools and come out. It was shown that such meeting disturbed the miners, who were afraid of violence, and that the works would be blown up; that they had no disagreement with their employer, and a large majority of them did not desire to strike, but many said they

---

¶ 2. See Injunction, vol. 27, Cent. Dig. §§ 174, 175.

would quit work unless they could be protected. *Held*, that such action by defendants was a violation of the injunction, and a contempt of court.

On Rule for Contempt.

Reese Blizzard, U. S. Dist. Atty., A. B. Fleming, W. S. Meredith, John W. Davis, and E. F. Hartley, for the rule.

V. B. Archer, John J. Coniff, Charles D. Johnson, and A. G. Fickeison, for defendants.

JACKSON, District Judge. Upon the 19th day of June, 1902, the Guaranty Trust Company of New York filed its bill, duly sworn to and verified by the affidavit of R. J. Jones, the company's agent, in the circuit court of the United States for the Northern district of West Virginia, against Thomas Haggerty and others, defendants, some of whom are citizens and residents of the state of Pennsylvania, some of the state of Illinois, others of the state of Ohio, and others who are citizens and residents of the state of West Virginia. The bill alleges that the Clarksburg Fuel Company is a corporation organized and existing under the laws of the state of West Virginia, and doing business in said state, with its principal office or place of business at Clarksburg, W. Va. It is alleged that the Clarksburg Fuel Company is the owner of a large number of mines and mining plants; that it owns in fee simple about 3,800 acres of coal land; that it also controls about 2,200 acres of coal land by virtue of leases executed to it; that it is engaged in mining coal and manufacturing coke, and shipping the same to the open market in the United States of America; that the product of said compay's mines is large, amounting to about 4,000 tons per day; that it has customers residing in all parts of the United States; that a large portion of its trade is during the summer months in the Northwest, and the coal is carried to that region by steamers upon the Lakes, and can only be carried in the season that navigation is not interrupted by ice; that the company has made large contracts for the future delivery of coal; and that its profits and earnings depend largely, if not altogether, upon its mining and producing coal during the summer season of the year. The bill alleges and avers that, to enable the Clarksburg Fuel Company to successfully carry on its business and pay for the many improvements made by it in operating its mines, it was compelled to execute a mortgage or deed of trust to the Guaranty Trust Company of New York, the plaintiff in this action, on the 26th day of September, 1901, to secure the payment of bonds amounting to $2,500,000, which is evidenced by 2,500 bonds of the denomination of $1,000, each, and that 500 of said bonds have been sold or pledged as security for their loans or indebtedness, so that the said company became indebted by virtue of the said mortgage or deed of trust and the issuing of said bonds to the full amount of $1,450,000, due and payable on the 1st day of October, 1931, which indebtedness still exists, and is secured by the mortgage referred to. That by the terms of the said mortgage the company is to pay 6 per cent. interest semiannually upon this debt, and, in the event of a default to pay the said interest when it becomes due, the whole indebtedness becomes due and payable. The bill alleges that the Guaranty Trust Company

of New York, the plaintiff in this action, is the trustee in the mortgage, and has loaned the Clarksburg Fuel Company $950,000. To guaranty and secure the payment of said loan, the said Clarksburg Fuel Company executed to the plaintiff its note. for $950,000, and has deposited as collateral with the Guaranty Trust Company of New York 2,000 of said bonds of the aggregate value of $2,000,000, payable on the 1st day of October, 1931, as a security and indemnity of this loan, and that the said interest has been paid up to the time of the filing of this bill, but no provision has been made for the accruing interest; that the Clarksburg Fuel Company will not be able to pay, from its earnings or otherwise, the interest accruing upon said bonds, except from the income which may be derived from the operation of its several mines and the product of those plants, and, in the event that the mines and plants should be closed, or partially closed, or seriously injured, or destroyed, the plaintiff alleges and believes that the interest which will hereafter become due will not be paid. The bill alleges that there is a general strike in the anthracite regions of the state of Pennsylvania, in which a large number of persons are involved, said to be 100,000 or more in number; that recently the person or persons at the head of the organization known as the United Mine Workers of America have announced their intention to cause or create a strike among the miners of the soft coal regions of the United States, and more particularly in the state of West Virginia, for the purpose of aiding the strike prevailing in the state of Pennsylvania, and to prevent the shipment of coal to localities that have been heretofore supplied with coal from the anthracite regions in the state of Pennsylvania; that for this reason the defendants Thomas Haggerty, Thomas Burke, Bernard Rice, William Morgan, Edward McKay, and Mary, alias "Mother," Jones, all nonresidents of the state of West Virginia, who are known as "organizers," "agitators," and "walking delegates," representing the United Mine Workers of America, have come into the state of West Virginia to create strikes among the coal miners or persons engaged in their trades or occupations, and whose particular business it is alleged is to effect a strike among the miners and employés of the said Clarksburg Fuel Company in and about its various mines. It is alleged that the defendants Haggerty and Jones addressed various meetings composed in part of coal miners, in which they attempted, in connection with the other defendants, to inflame and excite the hatred and animosity of the miners towards the proprietors of the coal mines, especially towards the persons connected with the Clarksburg Fuel Company and the Fairmont Coal Company, and in their speeches advised the miners to quit their work; that in some instances the miners have been assaulted by the strikers, and that in one instance a mine belonging to the Clarksburg Fuel Company was attempted to be blown up, and by the use of explosives the main head of the West Fork mine was blown up for a distance of some 50 feet, which entirely suspended operations in said mine; that the blowing up of said mine had a very bad effect upon all of the employés of the Clarksburg Fuel Company, which tended to intimidate those who were working in the mines, and to prevent them from continuing their work. The bill contains many other allegations of a similar character, alleging that

there is a combination of persons engaged in marching and passing by the mines and property of the Clarksburg Fuel Company, who held a meeting near one of the largest mines of the Clarksburg Fuel Company, the sole purpose being to alarm, intimidate, and frighten the miners working for the Clarksburg Fuel Company. The bill also charges a combination and conspiracy entered into by the defendants, with others, to bring about a strike; that, as a result of the acts of the conspirators, agitators, walking delegates, and strikers that some of the employés have been induced to strike, although most of them preferred to work and remain in the employment of the company, if they could be protected. The bill is quite lengthy, and contains many other statements, which the court deems unnecessary to notice, contenting itself with a substantial synopsis of the bill as herein stated. The prayer of this bill is to enjoin and restrain the defendants from entering and trespassing upon the lands and property of the Clarksburg Fuel Company; and to restrain them from going on or about the said company's tipples, tracks, or other property, together or individually, so long as they are not in the employment of the said company for the purpose of unlawfully preventing said company's employés in engaging and remaining in its employment; that the defendants, and each of them, be enjoined and restrained from assembling, congregating, or camping at or near the plants, mines, and places of business of the said company's property, or at or near the residences of the said employés, and the paths and roads traveled by the said employés in going to and returning from their work, for the purpose of preventing the employés of the Clarksburg Fuel Company from entering into or continuing in said company's employment by intimidation, threats, or otherwise, whether by physical force or otherwise, and whether by actual threats or otherwise to the person, property, or families of the said employés; that they be restrained from unlawfully interfering with the management of the business of the company; that the defendants, their confederates and their associates, be, each and all of them, enjoined from assembling together in camp or otherwise, near the mines of the company, or near the residences of its employés, whereby they would be disturbed, alarmed, or intimidated from working in the mines, and preventing them from passing to and from their houses to the mines, or from doing any personal injury to the person of the employés of the said company or others who are desirous of entering into or remaining in its employment, or interfering in any unlawful way with any person who desires to go into and remain in said company's employment, and from visiting the houses and places of abode of the persons who are in the employ of the company, who are desirous of remaining in the employment of the company, for the purpose of preventing them by threats, menaces, or actual injury to their person or their property, or to the members of their family.

Upon the filing of this bill, and upon the motion of counsel for the Guaranty Trust Company of New York, the court awarded a temporary restraining order restraining and inhibiting the defendants and all others associated or connected with them from in any way interfering with the management, operation, or conduct of said mines by their owners or those operating them, either by menaces, threats,

or any character of intimidation used to prevent the employés of said mines from going to and from said mines and of working in and about said mines; and the defendants are further restrained from entering upon the property of the owners of said Clarksburg Fuel Company for the purpose of interfering with the employés of said company, either by intimidation, or the holding of either public or private assemblages upon said property, or in any wise molesting, interfering with, or intimidating the employés of the Clarksburg Fuel Company, so as to induce them to abandon their work in and about said mines; and the defendants are further restrained from assembling in or near the paths, approaches, and roads upon and near said property leading to and from their homes and residences to the mines, along which the employés of the Clarksburg Fuel Company are compelled to travel to get to and from their work, or from in any way interfering with the employés of said company in passing to and from their work, either by threats, menaces, or intimidation; and the defendants are further restrained from entering the said mines and interfering with the employés in their mining operations within said mines, or assembling upon said property at or near the entrance to said mines, or from marching near to or in sight of said mines, or either of them, or of the residences of the said employés. The defendants are further inhibited and restrained from assembling together, in camp or otherwise, at or near or so near the mines of the Clarksburg Fuel Company, or at or so near the residences of its employés as to disturb, alarm, or intimidate such employés so as to prevent them from working in the mines, or to prevent or interfere with them in passing to and from their work at the mines, or in otherwise interfering with them as the employés of the Clarksburg Fuel Company. The purpose and object of this restraining order is to prevent all unlawful combinations and conspiracies, and to restrain all the defendants in the promotion of such unlawful combinations and conspiracies from entering upon the property of the Clarksburg Fuel Company described in this order, and from in any wise interfering with the employés of said company in their mining operations, either within the mines or in passing from their homes to the mines and upon their return to their homes, and from unlawfully inciting persons who are engaged in working in the mines from ceasing to work in and about the mines, or in any way advising such acts as may result in violations and destruction of the rights of the Clarksburg Fuel Company. A copy of this order was served upon the defendants in this case on the 19th and 20th days of June, 1902, prior to the order of arrest, issued in this case for an alleged contempt in violating the restraining order of this court.

The question for this court now to consider is whether or not the defendants violated its order, and, if so, to determine what punishment shall be imposed upon them for its violation. The consideration of this question ordinarily would involve the power of the court to issue injunctions in cases of this character. This court, however, has heretofore upon repeated occasions recognized the power of the court to issue injunctions in cases where there is a combination and conspiracy upon the part of any class of people to

prevent them from interfering with the business of others. What is an injunction? Is it the exercise of an arbitrary power by the courts of the country, or is it a power that has been recognized from a very early date as one of the branches of administrative justice? I answer this question by affirming that the ordinary use of the writ of injunction is to prevent wrongs and injuries to persons and their property, or to reinstate the rights of persons to their property when they have been deprived of it. It is the most efficient, if not the only, remedy to stay irreparable injury, and to punish those who disobey the order of a court granting the writ. In the language of the text-writers, it is prohibitory and restitutory. Mr. Justice Story, in speaking of the writ of injunction, says "that a writ of injunction may be described to be a judicial process, whereby a party is required to do a particular thing, or to refrain from doing a particular thing, according to the exigency of the writ." A similar writ to this was in use in the days of the Roman empire, and has always been in use in England from the foundation of the common law. It has been in use in this country since the organization of the government. It is not the exercise of any new power by the court, but it is simply an application of the writ to a new condition of things that exists in our day by reason of the advancement in civilization. It is a mistaken idea to suppose that the courts of this country abuse this writ. In my long experience on the bench I cannot recall a singe occasion when any court, either federal or state, ever abused it in what are known as "strike cases." It is true that our courts have been criticised severely by persons who are inimical to the use of it, and have denounced the courts for "governing by injunctions." But this criticism is so obviously unjust to the courts that it is unnecessary to enter into any defense of them. For five or six centuries back it was not an uncommon thing for the courts of our English ancestors to grant a prohibitory writ, as well as a writ of restitution, against persons who combine for any unlawful purpose. It is not my purpose to enter into any lengthy discussion of the remedies by injunction other than to state what seems to me to be the well-settled rule of law in its application to strikes,—that the power of the court may be invoked to restrain and inhibit a combination which is formed to induce employés who are not dissatisfied with the terms of their employment to strike for the purpose of inflicting injury and damage upon the employers. 1 Eddy, Combinations, p. 423, § 525. In the case we have under consideration the bill alleges that there is a combination of persons who are known as "organizers," "agitators," and "walking delegates," who come from other states for the purpose of inducing a strike in the soft coal fields of the state of West Virginia; that their object and purpose is to induce persons who are not dissatisfied with the terms of their employment, and who are not asking any increase in their wages, to cease work for their employers, thereby inflicting great damage and injury upon them. It is to be observed that a very large portion of the miners in the employ of the Clarksburg Fuel Company do not want, in the language of one of the agitators who is enjoined, "to lay down their picks and shovels and quit work." I do not question

the right of the employés of this company to quit work at any time they desire to do so, unless there is a contractual relation between them and the employer which should control their right to quit. At the same time I do not recognize the right of an employer to coerce the employés to continue their work when they desire to quit. But can it be said that where a conspiracy exists to control the employés, as in this instance, either by threats, intimidation, or a resort to any other modes usually accompanying the action of strikers, that such action upon their part is not only illegal, but a malicious and illegal interference with the employer's business? The question is its best answer. While I recognize the right for all laborers to combine for the purpose of protecting all their lawful rights, I do not recognize the right of laborers to conspire together to compel employés who are not dissatisfied with their work in the mines to lay down their picks and shovels and to quit their work, without a just or proper reason therefor, merely to gratify a professional set of "agitators, organizers, and walking delegates," who roam all over the country as agents for some combination, who are vampires that live and fatten on the honest labor of the coal miners of the country, and who are busybodies creating dissatisfaction amongst a class of people who are quiet, well-disposed, and who do not want to be disturbed by the unceasing agitation of this class of people. In the case we have under consideration these defendants are known as professional agitators, organizers, and walking delegates. They have nothing in common with the people who are employed in the mines of the Clarksburg Fuel Company. The evidence in this case shows that their only object and purpose is to get the people who are in the employment of the Clarksburg Fuel Company to go out upon a strike, as it is termed, for the purpose of compelling the owners of the mines to advance an increase in their wages. It discloses that the miners in the Pinnickkinnick mines are making an average of $4 a day in excess of their legitimate expenses, many of whom have worked in foreign countries for less that a half a dollar a day. The defendants in this case are not laborers in the mines, and have no connection with them whatever. Their mission here is to foment trouble, create dissatisfaction among the employés in coal mines, producing strikes, which tends greatly to damage and injure the business of the employers. In this case there is no dissatisfaction among the larger number of the miners. Only a small part of them have quit the mines from fear of intimidation, threats, and violence, but those remaining in the mines say they will quit work unless they are protected against the threats of these agitators and organizers. The strong arm of the court of equity is invoked in this case, not to suppress the right of free speech, but to restrain and inhibit these defendants, whose only purpose is to bring about strikes, by trying to coerce people who are not dissatisfied with the terms of their employment, which results in inflicting injury and damage to their employers, as well as the employés.

It is apparent that, if these agitators are permitted to interfere with the orderly, well-disposed miners who are anxious to work, and contented with the wages they receive, in the end this contented class

of miners would, through fear, intimidation, as well as threats, be induced to throw down their shovels and picks, and cease to work in the mines, whereby the Clarksburg Fuel Company would be greatly damaged. Not only would it be greatly damaged, but it would be prevented from fulfilling its contracts for the future delivery of the product of its mines. The right of a citizen to labor for wages that he is satisfied with is a right protected by law, and is entitled to the same protection as free speech, and should be better protected than the abuse of free speech, in which the organizers and agitators indulge in trying to produce strikes. The utterances of "Mother" Jones in her public address at or near the Pinnickkinnick mines on the 20th day of June, 1902, should not emanate from a citizen of this country who believes in its institutions. Such utterances are the outgrowth of the sentiments of those who believe in communism and anarchy. It is idle for this class of people to attempt to shield themselves from, not only a just criticism of their principles, but from their violations of law and order, by citing and relying upon the principles contained in our immortal Declaration of Independence, inspired by the pen of Thomas Jefferson, and also the first article to the amendment of the constitution of the United States protecting "freedom of speech." The rightful exercise of freedom of speech is not denied, but the abuse of it. Its unrestricted license has always been open to the animadversion and condemnation of the law. No publicist or statesman loyal to his country ever claimed that free speech gave the right to any one to advocate and defend treason to his country, or destruction to its institutions. The abuse of free speech is the germ or vital element upon which anarchists feed and formulate their conspiracies against the government and rulers of nations, whose only object and purpose is a desire to destroy the social and political form of all governments. The abuse of free speech inspired the anarchists and assassin to take the life of our late beloved president. May I not respectively ask the question whether it is not time for our lawmakers, both federal and state, to consider the question whether freedom of speech should not be so restricted by statutes as to suppress seditious sentiments. Under this condition and the circumstances surrounding the mines of the Clarksburg Fuel Company, the plaintiff in this bill applied for an injunction, which was granted by this court, to protect its property, and to restrain the defendants in this case from interfering with its employés in operating and working their mines. It is contended by one of the counsel for the defendants in this case that the injunction was too sweeping in its character, and should be modified; while another counsel for the defendants thought that there was no objection to the terms of the injunction, but contended that the order of injunction as granted by the court had not been violated. The right and power of a court of equity to issue an injunction upon the allegations of this bill cannot, at this day, be questioned. Numerous decisions could be cited to sustain this position, but the only case that the court deems necessary to refer to to sustain its power and authority to issue this injunction is the case of In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092. It is true that the bill in that case was filed under the interstate commerce act, but it is equally

true that the general principles of law upon which that bill was filed and sustained are as applicable to cases of the character that we have under consideration as they were to that case. It is well established that courts of equity may be resorted to to redress grievances, "where the object sought cannot be as well attained in the ordinary tribunals of the country." In the case under consideration there is no adequate remedy at law. In fact, the law furnishes no satisfactory remedy against irresponsible, itinerant, professional agitators unless the powers of the courts of equity are invoked. This was conceded by Debs in his testimony before the United States strike commission, referred to by Justice Brewer in his case.

So far I have only considered the power and authority of the court to award the injunction in this case. This brings me to the consideration of the question of contempt, and whether or not the defendants in this case have violated the injunction of this court. The evidence in this case shows that all the defendants were served with copies of the injunction prior to the order of arrest; that a portion of them was served on the morning of the 20th of June; that in the afternoon of that day they assembled at and near the Pinnickkinnick mine, a mine of the Clarksburg Fuel Company, and there held a public meeting, a distance of about 1,000 feet from the opening of the mine, about 150 feet from the property itself, and not far from the houses of the miners, all of which places were in plain view and sight of the people holding the meeting; that the principal speaker was Mrs. Mary Jones, who was known by her co-agitators, organizers, and walking delegates as "Mother" Jones; that at the meeting all of the defendants were present, applauding and cheering her while she was making her speech, and indorsing the sentiments that she uttered upon that occasion; that Thomas Haggerty, one of the leaders of the agitators, stated "that the injunction didn't amount to anything; that it was a farce, and would not stop and prevent other men from taking their place in the event that the court enjoined them from interfering with the miners." The evidence shows that Mrs. Jones called the miners slaves and cowards; she criticised the action of the court, and said she did not care anything for injunctions; that if they were arrested, or anything done with them, the jails would not hold the agitators that would be there to take their place; that it was the duty of every man there to urge the men that were at work in the mines to lay down their tools; she said that if she or any of the agitators were arrested others would take their place, and the injunction would not stop them; she advised the men to strike; she stated that it was the duty of all of them to influence the men at work to lay down their tools; she further stated that if they would come to Illinois they would be taught how to fight, and then they could come back and take care of themselves; she stated that the judge was a hireling of the coal company, that the coal operators were all robbers, and that the reason that the court stood in with them was that one robber liked another; she said in her speech to pay no attention to Judge Jackson or the court; for them not to listen to Judge Jackson, or any one else, or pay any attention to the court, but just make the miners lay down their tools

and come out. This was the concurrent testimony of nine witnesses as to the material facts who were examined upon the rule for contempt, and the evidence was uncontradicted as to those facts; but there was a difference in the recollection of the witnesses as to what "Mother" Jones said about the court. It is true that "Mother" Jones denied some of the statements of the witnesses, but her denial was not positive, but equivocal. She admitted on the witness stand that she stated in her speech "not to fear injunctions." She admitted in her answer to this question put to her: "Wasn't your purpose to go as near to those mines as you could to hold that meeting without a violation of the injunction? Were you in your judgment violating the injunction?" Her answer was, "Perhaps that was." It must be evident to every unprejudiced mind that the object and purpose of these agitators was to hold a meeting so near the mines of the Clarksburg Fuel Company as to alarm and intimidate the miners that were at work in the Pinnickkinnick mines, and in the language of Mrs. Jones to get them "to lay down their picks and shovels and quit work." The evidence discloses that Haggerty, Morgan, Wilson, Rice, and the other defendants were present at this meeting, took an active part in it, applauded the speech of Mrs. Jones, indorsed her sentiments, and at the time of their arrest advised the miners to continue the strike. It is in evidence that, after Haggerty was released upon his recognizance, one of the conditions of which was that he should not violate, incite, aid, encourage, or abet the violation of the injunction of the court granted in this case, directly or indirectly, either in spirit or in letter, presided at a public meeting, in which the action of this court was criticised and denounced for granting this injunction, at which time it is alleged that the principal speaker upon this occasion stated that the judge should be impeached, while the court had their cases under consideration. It is in evidence that they rented an unoccupied lot to hold their meeting in the open air, where they all assembled, and Mrs. Jones addressed the meeting. We must infer from the evidence what their purpose was. They were forbidden by the injunction "from assembling together, in camp or otherwise, at or near or so near the mines of the Clarksburg Fuel Company, or at or so near the residences of its employés, as to disturb, alarm, or intimidate such employés so as to prevent them from working in the mines, or to prevent or interfere with them in passing to or from their work at the mines, or in otherwise interfering with them as the employés of the Clarksburg Fuel Company." There can be no question that the defendants violated this clause of the injunction, for they assembled within 1,000 feet of the tipples and opening of the mine, within 300 or 400 feet of the residences of the miners, and within about 150 feet of the property of the Clarksburg Fuel Company. It is further disclosed in the evidence that the miners, in passing to and from their homes to the mines, had to pass near the place where the meeting was held, which was within plain view of the mines. And the evidence further shows that the noise and confusion created by the meeting could be heard distinctly at the mouth of the mines and where the tipples were; that those who were working in the mines were constantly sending out by the

employés engaged in hauling the coal to the tipple for news, which was carried back to the miners, creating more or less alarm, disquiet, and intimidation to those working inside of the mine, and that "they were afraid of personal injury and being blown up." As a result of this meeting, quite a number of miners left their work, and other persons who were employed to take their places were prevented from doing so by this agitation and excitement.

I reach the conclusion that the defendants in this case, who were served with notice of this injunction, have violated it, and have treated with contempt the order of this court. As a consequence of their action, this court will have to punish them for their contempt in violating this injunction. It would have been far better for them to have pursued the usual legal methods by moving the court either to dissolve or modify the injunction; and Mrs. Jones admitted on the witness stand that she "knew very well that if she and her confederates wanted to test the injunction the way to do it was to come into court and have it dissolved." Instead of pursuing that course, they elected to defy the court's injunction, and openly disregarded their duties as good citizens of the country by setting a precedent in open defiance of the injunction, which tends to promote disorder, which, if permitted to go unpunished, would sooner or later lead to anarchy. I cannot forbear to express my great surprise that a woman of the apparent intelligence of Mrs. Jones should permit herself to be used as an instrument by designing and reckless agitators, who seem to have no regard for the rights of others, in accomplishing an object which is entirely unworthy of a good woman. It seems to me that it would have been better far for her to follow the lines and paths which the Allwise Being intended her sex should pursue. There are many charities in life which are open to her, in which she could contribute largely to mankind in distress, as well as avocations and pursuits that she could engage in of a lawful character that would be more in keeping with what we have been taught and what experience has shown to be the true sphere of womanhood.