### UNITED STATES v. COLO et al.

#### (District Court, W. D. Arkansas. September 1, 1914.)

**1. INJUNCTION (§ 230*)—STRIKE INJUNCTION—VIOLATION—PROCEEDINGS TO PUNISH—NATURE AND CHARACTER.**

A proceeding to punish certain union miners for violating a strike injunction against violence is criminal in character.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 502–516; Dec. Dig. § 230.*]

**2. INJUNCTION (§ 223*)—STRIKE INJUNCTION—INCITING OTHERS TO VIOLENCE.**

Where an injunction against certain union miners had been issued, restraining violence against the property and nonunion employés of a mining company, language or conduct intended to incite others to violence and to a violation of the court's order constituted a punishable contempt.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 448–473; Dec. Dig. § 223.*]

**3. INJUNCTION (§ 230*)—STRIKING INJUNCTION—VIOLATION—EVIDENCE.**

In proceedings for alleged violation of a strike injunction prohibiting interference with the workings of a mine, its property, employés, etc., or the exercise of violence towards nonunion employés, evidence *held* to require a conviction of some of the defendants, and insufficient to establish the guilt of others beyond a reasonable doubt.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 502–516; Dec. Dig. § 230.*]

**4. CRIMINAL LAW (§ 168*)—OFFENSES—AUTREFOIS CONVICT.**

Conviction of certain union miners for violating a strike injunction, prohibiting acts of violence against the property and nonunion employés of a mine operator, on a charge of contempt for an offense which is also a crime, does not bar a prosecution for the crime.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 290–303; Dec. Dig. § 168.*]

Proceedings by the United States against Morrow Colo and others, for alleged violation of a strike injunction. Judgment against certain of the defendants, and certain other defendants discharged.

J. V. Bourland, U. S. Atty., and Read & McDonough, all of Ft. Smith, Ark., for the United States.

Webb Covington, of Clarksville, Ark., and R. W. McFarland, of Greenwood, Ark., for defendants.

J. W. Goolsby, of Hartford, Ark., for defendant Loyd Claborn.

YOUMANS, District Judge. On the 9th of May, 1914, in the case of Mammoth Vein Coal Mining Co. v. M. Hunter et al., this court rendered the following decree:

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Now on this day came the complainant, by Jas. F. Read and James B. McDonough, its solicitors, and the defendants by their solicitors, Ben Cravens and Webb Covington, and the defendants having filed answer herein, this cause came on to be heard upon the evidence introduced and argument of counsel. And thereupon, upon consideration thereof, it was ordered, adjudged, and decreed as follows, namely: That this cause be dismissed as to said defendants, M. Hunter, John Bumpus, and Peter McMullan. And it is further considered, ordered, adjudged, and decreed by the court that as to all the other defendants named in the caption hereof, and each of them, and all other persons acting or co-operating with defendants, or conspiring or combining with them, or any person having notice of this order, be, and the same are hereby, perpetually restrained, individually and collectively, from interfering with, injuring, obstructing, or stopping by force, threats, or intimidation any of the business of complainant, and from in any manner interfering with the property of complainant, or trespassing upon the same, whether the same is specifically described in this decree or not, which property is generally described in such complaint as Prairie Creek Coal Company mine No. 4, and Mammoth Vein Coal Company mine No. 1, near the town of Midland, in the county of Sebastian, state of Arkansas, and from entering upon any of the grounds or premises occupied by the complainant as aforesaid for the purpose of interfering with the business of complainant or with the property or employés of complainant, and from compelling by threats and force and violence, or by direct or indirect coercion, any of the present or future employés of complainant from performing their duties as such employés, or in doing any act whatever in furtherance of a design to restrain or prevent, by unlawful conduct, complainant from operating its said mines, and said defendants and each of them. and such persons unlawfully associating or conspiring with them, or having knowledge of this order, be further restrained from in any manner unlawfully interfering with any person or persons that the complainant may hereafter bring or cause to be brought to its said mines heretofore referred to, or from encouraging or abetting any person or persons to threaten or coerce, directly or indirectly, any person or persons that may enter or continue in the employment of the complainant, and that they and each of them, their confederates or associates, or persons having knowledge of this order, be enjoined from assembling in or upon the premises of complainant, for the purpose of holding disorderly or riotous meetings, or for the purpose of effecting unlawful interference with employés of complainant or with its property, and from in any manner damaging or destroying the property of complainant. It is further ordered that printed copies of this decree be made and posted at and about the said mines of complainant and at other public places in the said county of Sebastian and state of Arkansas. It is further ordered that the marshal of this district be, and he is hereby, directed to adopt such measures and use such means as may be necessary to enforce this decree. It is further considered, ordered, and decreed by the court that the complainant have and recover of and from the defendants above named, except the said M. Hunter and John Bumpus and Peter McMullan, all its costs herein laid out and expended, and may have execution therefor, and jurisdiction of this cause is retained for the purpose of taking such action herein as the court may deem necessary for the enforcement of the decree."

On the 13th of June the plaintiff in that case filed a motion for an attachment against Morrow Colo, Foster Bean, Sandy Robinson, Blue Johnson, James Slankard, P. R. Stewart, and Frank Gripando, for contempt in violating the orders of the foregoing decree. On the 20th of June the Mammoth Vein Coal Mining Company filed a similar motion containing charges against John Manick, Sandy Robinson, and Clint Burris. Foster Bean, Morrow Colo, and Blue Johnson have not yet been arrested. The cases against each of them will be continued. The other cases were heard together.

On July 27th, after the evidence on the original charges had been

taken and the cases submitted, a motion was made to reopen them to allow additional testimony to be introduced, growing out of an alleged attack on mine No. 4 by an armed mob, the killing of two of the company's employés, and the burning and blowing up of its property. The motion was sustained as to P. R. Stewart, but was denied as to all others. Motions were then filed for attachments for contempt against John Manick, Frank Gripando, Loyd Claborn, Pink Dunn, and George Burnett, charging them with having been members of the mob. Testimony was then introduced as to the occurrences of July 17th.

[1] Each one of these cases is a criminal proceeding. Merchants' Stock & Grain Co. v. Board of Trade, 201 Fed. 20, 120 C. C. A. 582. The charges against Sandy Robinson, Clint Burris, and John Manick contained in the motion filed June 20th will be considered together. These three men were defendants in the case in which the decree was rendered. They were prominent in the occurrences of the 6th of April, when a large number of Union miners and their sympathizers attacked the employés of the Mammoth Vein Coal Mining Company and compelled that company to stop for a time the operation of its mine as an open shop. After the issuance of the injunction, the Mammoth Vein Coal Mining Company undertook again to operate its mine, called No. 4, as an open shop. For the purpose of protecting its employés and property, it employed a number of armed guards. Robinson, Burris, and Manick lived at Prairie Creek, only a short distance from mine No. 4. Prairie Creek is a station on the line of the Midland Valley Railway. The line of railway passes mine No. 4 at a point nearer than Prairie Creek. By a rule of the railroad company, its passenger trains stop at No. 4 when there is a certain number of passengers who desire to get off there.

On the 15th of June, 1914, a number of employés of the Mammoth Vein Coal Mining Company were on the train going from Ft. Smith to mine No. 4. At Midland Robinson, Burris, and Manick, with others, boarded the train. There is testimony tending to show that all three had baseball bats. It is admitted by Burris and Manick that each one of them had a bat. The passenger car was divided into two compartments. The employés of the coal company were in the smoking compartment of that car. There is testimony to the effect that these three men came into that compartment and began to ask the employés where they were going. On ascertaining that they were going to No. 4 to work, Robinson, Burris, and Manick began to curse them and call them "scabs," and applied to them opprobrious epithets. There is testimony that Burris held a bat over the head of one Boraski, and told him that he should not get off at No. 4. There is also testimony that, on the arrival at mine No. 4, Manick called to Robinson and Burris to stand at one end of the car and he would stand at the other, and that they would not let these "scabs" out. One witness testified that, in coming out of the car, he was struck from behind, and on looking around Robinson was the man nearest him. The testimony of Robinson, Burris, and Manick was that they had done nothing except to endeavor to persuade certain men not.

to work at the mine, and did succeed in persuading one man, by the name of Abe Harris, who remained on the train; that Burris refunded the amount of Harris' fare to the company's agent.

D. O. Stout, who was on the train, testified as follows:

"Q. If there was anything out of the ordinary occurred on that train, in your own way tell the court what it was. A. I don't think of anything only they had some boys going to No. 4 to work, and these union boys, it seems, got on, and they were talking about this, and they were talking and telling them how it was, and trying to get them not to go back to work, and I think there was some that got in conversation with them, and I think there was some one said that he didn't know what he was getting into, and he wouldn't get off."

The testimony of the witness Emery was to the same effect. He also said that Robinson, Burris, and Manick "didn't have any baseball bats that he knew of."

Mrs. Cox testified that she was in the ladies' compartment, and that Robinson came in there and talked to her on the way from Midland to No. 4.

Dr. Routh testified that he also rode in the ladies' compartment, and that he heard nothing in the way of threats.

After a consideration of all the testimony, I am convinced that Burris, Robinson, and Manick did use threats on that occasion against the employés of the company and endeavored to intimidate them, and that in so doing they knowingly violated the court's orders. In my opinion the presence of armed guards and a deputy United States marshal, who met the train at the stopping point, alone prevented an attack on the employés.

Sandy Robinson is separately charged with having cut some sacks of feed belonging to the Mammoth Vein Coal Mining Company on the platform at Prairie Creek. This was on May 18th. The feed was being unloaded from a Midland Valley car for the purpose of being taken to mine No. 4. The testimony is that Robinson was there and engaged in an altercation with a mine guard, and that he took out his pocketknife and cut five sacks. I am convinced that this is true, notwithstanding his denial, and the testimony of witnesses tending to show that he was not there.

The defendant P. R. Stewart, at the time of the occurrences herein mentioned, was president of district No. 21 of the United Mine Workers of America. He was present during the trial of the case of Mammoth Vein Coal Mining Co. v. Hunter et al. He heard all the testimony, sat with counsel for the defendants during the trial, and heard the opinion of the court when it was handed down. He therefore had full knowledge of the issuance of the injunction and its terms. The charge against him consisted of certain statements made by him. On May 25th Stewart went from Ft. Smith to Midland in an automobile in company with Paul Little, state prosecuting attorney. While at Midland, Stewart made some statements in front of McGee's Drug Store.

Dr. O. M. Neal testified as follows:

"I was not in the drug store when they came up. I was down the street a ways. I think he and Paul Little came down there together, and Mr. Stewart

had gotten out of the car, and Mr. Little also, and Mr. Little had gone up the street when he got there. I don't know what Mr. Stewart was saying when he got up there. The remark that attracted my attention was something like this: 'That they armed them scabs up there and allowed them to parade up and down our public highways and curse our wives and beat us up.' And he put his hand up to his side, and says, 'That man'—I cannot call his name. I believe he said his name was Bailey, the man that put him out of business down at Hartman, kicked him when he was down. He says, 'If they don't want a Colorado in Oklahoma, they had better stop that, for after this week all the men that want arms can get them.' That is about the way—about what he said."

### Dr. Neal testified further as follows:

"Q. Did he make a statement as to where they could get the guns if they wanted them? A. No, I don't believe he did. He said he wanted it distinctly understood; that it was no secret; it was a public thing that they were armed; that any man had a right to arm for the protection of his home, that wanted it, I believe. Well, I believe he said that any man that wanted a gun, he would see that he got it."

### J. F. York testified as follows:

"Q. Did you hear a man at McGee's store on the 25th, at Midland, make a statement to a crowd, with reference to this mine trouble, or anything connected with it? If so, state what you heard. A. I heard a man make a few remarks. He seemed to be talking to five or six of the boys; two remarks only. I didn't know who he was. I was told he was Stewart. Q. You may tell what he said. A. I stepped out of McGee's store, just on the pavement in front of the store, and there was a man came up to my left and passed towards him, and I never did reach him. He was remarking to a half a dozen men, about that number. He never introduced us. It really did not attract my attention; and the remark I heard was this: That the men couldn't stand everything; that they had better die. And then somebody said something about a gun, or guns (I don't know whether they were saying it in the plural or in the singular), and this man that made the remark and was standing there talking to the other men said, 'You can get all the guns that you want.' What they were talking about, I don't know. That is all I heard said, and the man that made the remark walked right on in the street away from the crowd immediately after he made the second remark. Q. Was that (pointing to Stewart) the man that was pointed out as president of the United Mine Workers? A. Yes, sir. Q. You did not hear the conversation that took place before you got there? A. That is all I heard."

### T. J. Porter testified as follows:

"Q. On the 25th of May, of this year, please state whether or not you heard Mr. Stewart make any remark at McGee's store at Midland. A. I don't remember the date, but I heard him make a statement. Q. I wish you would state to the court what he said, as well as you remember? A. He said that the Bache-Denman guards were carrying guns up and down the public highways, and that they must be stopped. I don't know that I heard all that he said; that they were carrying guns up and down the highway; and he said, 'Next week that all the men that wanted guns could have them,' and that also there would be another Colorado trouble. Q. What men was he talking about; what men could have guns if they wanted them? A. I suppose—well, I don't know what he meant unless he meant the miners. Q. Did he say anything about the mine running as 'open shop'? A. No. I remember of hearing him say rather than see them work out there, he would go out there and die himself. Q. Rather than see them work 'open shop'— A. At No. 4. Q. He would go out and die himself? A. Yes, sir. Q. Did he make, in that connection, any statement as to whether or not he was armed at that time? A. Yes. He said he was carrying his gun, and he advised every one else to do so; that he was taking that responsibility on himself. Q. State whether or not he was

making that conversation, or making that statement publicly, or whether he was making it privately? A. He was making it publicly. He said there was no secret. Q. What did he say about another Colorado? A. He said next week there would be another Colorado trouble at No. 4. Q. You heard him say that he was carrying his gun himself? A. Yes, sir. Q. What did he say about others carrying their guns? A. He said he would take that responsibility on himself, and next week anybody that wanted a gun could get one."

## B. Bishop testified as follows:

"Q. Do you know where McGee's store is over at Midland? A. Yes, sir. Q. Were you there on May 25, 1914? A. Yes, sir. Q. Do you know a man named P. R. Stewart? A. Yes, sir. Q. Did you hear Mr. Stewart make a statement on the day named at McGee's store? A. Well, I heard him make a statement; yes. Q. What did he say? Give his exact words as near as you can remember. A. I don't know as I could give his exact words. Q. Give them as near as you can remember. A. He made a statement about all the men that wanted guns they could get them, so far as that was concerned. Q. I wish you would repeat that. I did not hear it. A. All the men that wanted guns could get them. Q. I will ask you to state if he said anything about getting the guns himself for them; whether he said he would get them, or whether he said the men could get them. A. I didn't understand it that way. The way I gave it is the way I understood it. Q. You made an affidavit on the 27th, didn't you? A. Yes, sir. Q. For the purpose of refreshing your memory, I will ask you to say if you didn't say in that that you heard him say that, if the union men needed any guns, he (Stewart) would see that they got them? A. I didn't understand it that way. Q. You have given it as your understanding? A. Yes, sir. Q. What else did he say, if anything? Did he say anything about a Colorado trouble? A. Well, I believe he did say if they wanted trouble like the Colorado, they could get it. I didn't hear it all. Q. I know. I am just asking you what you heard. What did he say, if anything, about whether or not he would die before he would see the mine at No. 4 run 'open shop?' What did he say on that subject, if anything? A. He said he would pick up a gun and die himself before he would see it run 'open shop.' Not in them words, hardly, but they meant that way."

## On cross-examination the witness said:

"Q. Did you hear anything said about two of those guards having abused some women and children over there? A. I don't believe I did. Q. I will ask you if Stewart did not make this statement: 'I am advised that two of those guards over there abused two little girls on the road from school to home'— and upbraided them for it, the mother upbraided them for it, and they cussed her out. A. No, sir; I didn't. Q. If any man—the thing is public property over there, then, if the men wanted guns to protect their homes, they could get them. Isn't that what he said? A. Well, I believe that is. He did say that they were abusing some children, and that is the way he brought it in. Q. And in that connection, didn't he also say that one of the guards, Riley Bailey—didn't he say that Riley Bailey, one of the guards, had fixed him when he was attacked at Jamestown, and kicked him in the side and about put him out of business, and that he was a bad man? A. Mr. Stewart did say that."

## Mr. McGee testified as follows:

"Q. Do you know Mr. P. R. Stewart, president of the United Mine Workers? A. This is the third time I ever saw him. Q. On May 25th, this last May, state whether or not you heard him make a statement at your store in Midland, if he made a talk to any men there. A. Well, that is about the time. Q. What was it you heard? Just give it to us. A. I was not outside. Q. Give your best recollection of all you heard. A. All I heard Mr. Stewart say, if that is Mr. Stewart there (pointing), was that they could all have guns that wanted them, and that there would be a Colorado in a few weeks if

they wanted it that way. That is all I heard him say. Q. Did you hear him say anything on the subject of whether he was armed himself? A. No, sir."

Mr. Stewart testified as follows:

"Q. Are you president of district 21, United Mine Workers of America? A. Yes, sir. Q. How long have you been president of the district? A. I believe it is since 1908 or 1907. I don't remember which. Q. Did you hold any official position in the organization before you were elected president? A. Yes, sir. I was a regular officer since 1903. Before that time, I held the position probably a month or two at a time. Q. How long have you been connected with the organization as an official, in that capacity? A. I have been an official in the organization since 1903, and practically since 1890 I have been hired to go around and settle disputes and talk to the men, at different times. Q. You are charged here with having made a statement to a gentleman in Midland in front of McGee's drug store with reference to the court's order in this case. I wish you would state if you recall the trip that you made to Midland, and if you can state now about what was said on that occasion. A. As near as I can remember, I had information that a guard named Bailey and some guards had insulted some girl, and of course that made me pretty mad, I don't deny that, because it was the one who had insulted me previously in another county, and I got to Midland and got to talking to some of them people there, and I said it was reported that some women and children had been insulted, and I said it was an outrage that women and children should be insulted by such men, and, if we couldn't get any protection, it was my idea to arm the men in the Hartford Valley so that they could protect their own homes and so they could protect the women and children. I didn't have any idea in saying that that I was violating any order of Judge Youmans. I didn't have any idea that I was violating the injunction by saying that. If I thought I was violating the injunction by saying that, I wouldn't have said it. I thought it was the right any American citizen would have to protect the homes and the wives and children; that is, for the members of our organization. I had remembered the Ludlow affair when our women and children were murdered, and I didn't think there should be any such thing out there; indeed, my idea of it is that no man should be armed; neither side should be armed. I don't think men should be brought in who are ex-convicts and then go around carrying arms, and I think they all ought to be disarmed, and that when one side carries arms themselves, and the other side carries arms, the homes are going to be shot into in the night, and are afraid of their lives to live there, and request us to ship guns out there. There is no place to ship them to. No work in the country and I want to say now, as an evidence of my respect for the court, I want to say that I don't think there is any one in this country has any greater respect for the courts of this country than I have."

It will be seen that Mr. Stewart did not deny any of the testimony given by the witnesses as to what he said in front of McGee's store at Midland. He explains it by saying that he "had information that a guard named Bailey, and some other guards, had insulted some girls," and that that made him pretty mad. He said:

"It was my idea to arm the men in the Hartford Valley so that they could protect their own homes, and so that they could protect the women and children."

What was the occurrence that caused this outbreak on his part, and gave birth to the idea "to arm the men in the Hartford Valley"? He had just ridden from Ft. Smith to Midland with the prosecuting attorney, Mr. Little.

Mr. Little testified as follows:

"Q. Do you know P. R. Stewart? A. Yes, sir; I am personally acquainted with him. Q. Did you make a trip with him, or see him, at Hartford some time back, and, if so, at about what date? A. I made a trip with him to Midland, and I returned that evening as far as Bonanza, and he came back to Ft. Smith, and the next day I went to Hartford, and he happened to be on the same train I was. I don't remember the date. Q. Do you know Riley Bailey? A. I know him by name. I don't know that I would know him by sight. Q. Do you know Will Bohannon? A. I know Mr. Bohannon by name; yes, sir. Q. Had you, prior to the date you went to Hartford, had Bohannon arrested? A. I had three men arrested prior to the date on which I went to Hartford. Bohannon was one of them, but I do not recall whether Bailey was or not; but after the first arrest I did have a warrant issued for Bailey, charging him with a disturbance of the peace, by using abusive language towards a young lady over there. I believe, now, Mr. Bailey was one of the parties that accidentally got shot, was he not? Q. Yes, sir. A. That is the party that I speak of. Q. Did you try him? A. No, sir. Q. Why? A. Because he has sustained an injury accidentally down there, and was confined in the hospital here."

That was the incident that put the idea into Mr. Stewart's head, according to his testimony, "to arm the men in the Hartford Valley." The inference is permissible that he had gotten the facts from Mr. Little with whom he had ridden from Ft. Smith, and that he knew what Mr. Little had done with reference to instituting a prosecution against Bailey. Later, on the same day, he accompanied Mr. Little to mine No. 4, to investigate the accidental shooting of Bailey and Bohannon. He knew all of the facts, both of the alleged disturbance of the peace and the accidental shooting. He knew that Bailey had been arrested and would be tried as soon as he could leave the hospital. He knew that the situation did not justify his threat to arm the men in the Hartford Valley. There was nothing, so far as the attitude of the state and county officers towards offenses committed by employés of the Mammoth Vein Coal Mining Company was concerned, to warrant him in assuming authority to supplant the legal methods for the enforcement of the law. He made a speech at Hartford the next night at a gathering at which Mr. Little was present. With reference to that, Mr. Little testified as follows:

"Q. Now you say you made a trip with Stewart to Hartford. Did Stewart make a speech addressing the miners at Prairie Creek and Hartford, at the town of Hartford? A. I could begin at the beginning and give you my reasons for being there. I don't know why Mr. Stewart was there. One of the fraternal organizations of that town had a public installation and invited me to come over there and make them an address, and in response to that invitation I went over, and I engaged in a conversation with Mr. Stewart, who was on the train at that time, and I told him of the blow-out they expected to have there, and took the liberty to invite him to go with me to this banquet, and it was at that banquet that Mr. Stewart made an address. Q. Upon what subject? A. I made a speech on 'Fraternalism,' and, after that part of the program was completed, they served some cream and cake, and some of the parties had evidently found out the day before Mr. Stewart and myself were at No. 4, or at Midland, and they began to publicly ask me to make them a statement about what I found over there; at least it had been rumored that they had gotten into a fight among themselves, and they wanted to know about the conditions. I hesitated for some time, and they kept insisting, and I made them a little talk and gave them what information I had gathered. In the course of my remarks, I admonished them, like I had done privately to different individuals, that this was a very serious matter, and it was a time when they should let their best judgment govern them, and they

should not in any way violate the terms of the injunction that had been issued against them, and I complimented Mr. Stewart for the way in which he had, in my presence, advised the men to let the law take its course, and not interfere with the officers or property of the mine officials, and, after I had concluded my remarks, they voluntarily called on Mr. Stewart. He was present, and he got up, and he made them what I considered a nice little talk. He told of his early struggles as a miner, and he said he was always glad to be associated with the laboring people because he was one of them, and he was very proud of the fact that he was there on that occasion, and he went ahead then and told them what he had found out; and likewise he admonished them to let the law take its course and not to in any way conduct themselves so that it would be any contempt of court, and he went ahead there, and among the things he said, if I recall it in his manner of expressing himself. He used broken English, and he said: 'It is a serious condition that confronts us down there.' He says, 'In addition of these men coming in here and taking the places of the union men, from the reports that I have gathered to-day from different authorities, I learn that they are insulting women and girls,' to use his expression; and he says, 'That is one thing I won't stand for, for the womanhood and girlhood of the country to be insulted and run over in such a way, and stand for it, and, if they could get no protection under the law, in order to protect the women and girls he was willing to arm every man in the valley and fight and serve in the defense of the womanhood and girlhood of the country.' He may have made some remarks along that line, and sat down. That was about all that was said."

Stewart made this statement at Hartford more than 24 hours after he had made the statement in front of McGee's store at Midland. If the first statement was made in anger, the second was made after his temper had had ample time to cool. It was made after the prosecuting attorney had, in response to inquiries, stated the information he had gathered. There was no reason to presume that the officers and the courts were not able to cope with all violations of the law. Notwithstanding this, Mr. Stewart saw fit to repeat his threat, and that, too, in the presence of the prosecuting attorney, who permitted it to pass unrebuked.

The conviction cannot be avoided that the real object of Stewart was to prevent the operation of the mine as an "open shop." The charge against Bailey was merely a make-weight.

T. J. Porter, referring to Stewart's statement at Midland, said:

"I remember of hearing him say rather than see them work out there he would go out there and die himself."

Bishop stated:

"He said he would pick up a gun and die himself before he would see it run 'open shop.' Not in them words, hardly, but they meant that way."

After the injunction was made perpetual, and evidently after the charge was made against Bailey, Oliver Johnson, a deputy United States marshal, was on a train going from Greenwood to Midland. Mr. Stewart was on the same train going to Atoka, in Oklahoma. He entered into conversation with Mr. Johnson without knowing who he was. Johnson testified as to what was said as follows:

"Q. I wish you would state what that conversation was. A. He asked me— he came and sat by me and asked me where I was from, and I told him I was from Washington county down here. He says, 'I presume you are a farmer;' and I said, 'I was born and raised on a farm.' Then he spoke about a couple of girls down there that had been insulted by the employès at No. 4.

I asked him if he knew who the girls were, and he said they were farmers' girls, school girls. I said that I noticed that the papers referred to them having trouble about that mine, and he said, 'Lots of trouble;' and I said, 'The paper states that they are going to operate it with nonunion labor;' and he says, 'We don't aim to let them;' and I said 'we,' and he said 'the union'; and I said: 'What steps will you take to prevent it? The court has granted a permanent injunction, I understand.' And he says: 'Damn the injunction; the national government is against us, but the people are with us, and we don't aim to let them dig coal.' And he did not say how they aimed to prevent it. I believe that is the conversation, the substance of the conversation."

Stewart denies the statement to Johnson in an argumentative way. That is, that he could not have made the statement because it was contrary to the way he felt and different from the advice he had given the members of the union. His denial does not appear to me to be candid, and I am compelled to believe Johnson. From the testimony quoted, the conclusion must be that Stewart's real purpose was to prevent the operation of the mine as an "open shop" regardless of the injunction.

The testimony also shows that there was a shipment of arms from McAlester, Okl., to Hartford by Fred Holt, secretary treasurer of the union, to Oscar Layton. This shipment was made about the 16th or 17th of June. Holt testifies that these arms were sent in response to letters from members of the union, and were to be distributed among the members upon the arising of an emergency to be determined by him. Holt also testified that his action in making the shipment was approved by Stewart. The motions for attachment for contempt were filed on the 13th and 20th of June. Between the 20th and 25th of June, Stewart and Holt had a conference at McAlester, and it was decided that the shipment of arms might be held to be in violation of the injunction, and it was determined between them to have those arms shipped back to McAlester. They were sent back on the 3d of July; the hearing of the contempt cases having begun on the 1st of that month. Arms had already been sold to members of the union by a merchant at Prairie Creek by the name of Mastelle. Holt testifies that he took up, or caused to be taken up, all guns sold by Mastelle that had not been paid for, and became responsible for the price to Mastelle. Mastelle testifies that he had no transaction with Holt at all, and that all the guns sold by him were sold for cash, and that therefore he did not remember who bought them.

The reason assigned by Holt for the shipment of arms made by him were: First, because the coal company had armed its men; and, second, because arms were needed for the protection of the families of the members of the union, and that the civil authorities were powerless to afford them protection. These reasons will be considered in the light of the evidence.

The coal company had determined to run its mine as an "open shop." The union was opposed to such operation. If the coal company had no legal right to run its mine as an "open shop," there must have been some way, by orderly procedure in the courts, to prevent it. The union was endeavoring to prevent such operation, but not by legal proceedings. If it could accomplish its purpose by legal means,

no one had a right to complain. Its first effort was not by legal means. On the 6th of April its members and sympathizers assembled on the company's property, assaulted its employés, and compelled them to stop work. That method was unlawful. At the instance of the coal company, all persons engaged in that attempt, and all others, were enjoined from in any manner interfering with the company's property or employés. Notwithstanding the injunction, assaults were threatened. Shots were fired into the mine inclosure. It was necessary to keep armed men about the mine. From some time in June to the 15th of July deputy United States marshals were stationed at the mine. Even when men went to Midland for supplies, it was necessary for them to go armed. As before stated, the purpose of the union was to prevent the operation of the mine as an "open shop." That purpose was maintained despite the injunction. Some colorable pretext was sought in order to effect that purpose. The charge against Bailey was made, and that incident was seized upon by Stewart as a justification for arming the members of the union, notwithstanding the fact that Bailey was promptly arrested and held for trial. The testimony shows that every charge against the company's employés was investigated promptly. To show the activity of the local officers and the prosecuting attorney in prosecuting employés of the company, I will refer to certain testimony. Three of the employés with a supply wagon were sent to Midland for supplies. On leaving the mine, they placed two guns in the wagons.

W. B. Womack testified to what occurred at Midland as follows:

"Q. Were you in Midland on May 18th of this year? A. Yes, sir. Q. Did you see the supply wagon of the coal company in charge of Levi Brown and Charles Cheek, and some other employés of the company, at the time it was driving away from Midland? A. I saw the wagon. I don't know who was the owner of it, or any of the men. Q. Did you see some rocks thrown there by anybody? A. Yes, sir. Q. I wish you would describe what you saw. A. I was standing at the car door at the time the wagon left, the car. At the time the men had gone a few yards from the car, a bunch of men gathered across the street. I didn't know but one of the men that was throwing the rocks, and that was that Foster Bean. Foster Bean and a boy that looked to be 16 or 17 years old stepped out in the street and taken and threw rocks at the men at about 100 yards from there, and he stepped down and got off and tied one of their bread boxes that they had on the wagon, and they continued until one of the men stepped to the wagon and got his gun, and after that time the marshal came and arrested them. Q. Arrested whom? A. The men on the wagon."

J. W. Baker testified as follows:

"Q. Where were you on the 18th day of May? A. I was at Midland. Q. Were you there at the time the drivers of that wagon were arrested? A. Yes, sir. Q. Describe what you saw. A. When they were loading the stuff, some of the boys says, 'Let us rock them scabs; let us rock them scabs;' then they drove off down the street below the store, between the store and that little bridge down there, and they began throwing rocks at them, and Mr. Bohannon got out his gun, and they started, and he was sitting down when the marshal went and arrested them. Q. The men that were driving the wagon were in sight of you at the time the rocks were being thrown at them? A. Yes, sir. Q. Did these men do anything—the men that were in the wagon? A. No, sir; they did not do a thing. Q. Did you see them do anything to be ar-

rested for when they were arrested?  A. No, sir.  Q. How many rocks were thrown?  A. Well, I don't know.  I expect there was something near a dozen rocks, or maybe more.  Q. Did any of the rocks come near hitting the men in the wagon?  A. One of the rocks came pretty near hitting Mr. Brown."

This testimony was uncontradicted.  The prosecuting attorney testified as to the disposition of that case.  He stated that these men were prosecuted for disturbing the peace by brandishing firearms, and were fined.  He himself went to Midland and conducted the prosecution in the mayor's court.  As to the men who threw the rocks, he testified as follows:

"Q. Did you institute prosecutions against any of the men who threw the rocks?  A. I did not, because, after I inquired about it, they said they had been tried before and acquitted.  Q. In the night.  Did you know that?  A. If you want me to tell you what they told me—  Q. You had information that they had been tried before, and acquitted?  A. Yes, sir.  Q. You say you never instituted any proceedings against those men for throwing rocks?  A. No, sir. Q. You never instituted any prosecutions against anybody that was a union miner?  A. I never had any complaint against the union miners."

In this instance the uncontradicted evidence is that an employé of the coal company picked up a gun for the purpose of defending himself and two others with him against a crowd that was throwing stones at them.  The employés were arrested on a charge of disturbing the peace by brandishing firearms.  The prosecuting attorney went to Midland to prosecute them.  They were fined and convicted.  The men who had thrown the stones were acquitted.  Certainly no member of the union could say that the civil authorities were powerless or inactive in such a case.  The prosecuting attorney on his own initiative went from Ft. Smith to the mine to investigate the case of accidental shooting referred to, and took the president of the union along.  It cannot be said that, so far as charges against the company's employés were concerned, he did not act promptly.  In that regard his course is in strong contrast with his action with reference to alleged violations by members of the union, or their sympathizers.  On that point he testifies as follows:

"Q. Have you instituted any prosecutions in the state court for any of the things that occurred at the mine on April 6th?  A. Is that the date of this alleged beating up?  Q. Yes, sir.  A. No, sir; I have not, because I never learned who beat them up.  Q. Have you made any investigation to find out who beat them up?  A. Yes, sir; I have, and I intended to lay it before the grand jury at this time.  I told you the other day I would be glad to present any information you had.  Q. I told you that the matter was under investigation in the federal court, and that you could get some of the names of witness from the records there in the files, and that I had the information at my office, and that you were welcome to anything I had.  A. You said something like that.  I know when this matter first came up it was like trying to investigate the matter of who hung this nigger over here; we could not find out, because there were so many of them."

On redirect examination Mr. Little says:

"Q. Mr. McDonough (counsel for coal company) asked you if you had instituted any prosecutions.  Please state if he did not promise to turn over to you the information, so you could lay it before the grand jury.  A. That was my understanding when he and I had the conversation over there in the courtroom.  I understood that he was to.  He asked me why I did not prose-

cute these violations, and I told him that I had thought over the matter, and the matter was over there in the federal court, and they had enough power to enforce their orders, and I supposed they did not need any assistance from the state authorities to enforce their orders or enforce the injunction."

It will thus be seen from the testimony of the prosecuting attorney that, so far as the violations of the injunction were at the same time violations of the criminal laws of the state, those laws were suspended for the time being.

The conclusion is unavoidable that if the members of the union had obeyed the orders of the court, or if the officers of the county had shown the same disposition to prosecute violations of the law when committed by union men as when committed by employés of the company, it would not have been necessary for the latter to carry arms.

The argument is made by counsel on behalf of Stewart that, while he was opposed to the operation of the mine as an "open shop," he was also opposed to violence as a means of preventing such operation, because the end desired could and would have been effected in time without resort to violence. That conclusion is reached by this process of reasoning: The margin of profit to the coal operator in this field is very small, even when the mine is operated under the most favorable conditions and upon the most economical basis. Any added cost of production beyond that required by favorable conditions and economical management subtracts that much from the narrow margin of profit. If a condition could be brought about by which a sufficient sum could be added to the cost of production, not only would the profit be wiped out, but the cost of production would also exceed the value of the coal in the market.

It was the policy of Stewart, according to the argument of counsel, to have the union maintain such an attitude as would make the employment of armed guards, if not actually necessary, at least apparently so from the viewpoint of the coal company, and thus cause to be added, to the usual cost of the production of coal, such sum, by the expense of maintaining guards, as would result in loss to the company, and bring about the suspension of operation as an "open shop." According to that plan, the company was to be kept in a constant state of apprehension of an attack to the extent that it would continue to maintain guards, but it was in fact the intention of Stewart that the attack should never be made. Such an experiment in tight-rope walking could not result otherwise than in failure.

Putting on Stewart's acts and speeches the construction most favorable to him, he incited to action forces which he could not control. Occupying a position in which his influence could have operated powerfully for the maintenance of law and order, he saw fit to so deport himself as to incite to and encourage mob violence. He knowingly played with fire with a reckless disregard for consequences. His conduct was at variance with his declaration made on the witness stand, of respect for the court's order and his intention to be governed thereby.

[2] Language or conduct intended to incite others to a violation of the court's order is a contempt of court. U. S. v. Debs (C. C.) 64

Fed. 724; In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; U. S. v. Haggarty (C. C.) 116 Fed. 510; U. S. v. Gehr (C. C.) 116 Fed. 520. The effect of Stewart's policy, speeches, and conduct is seen in the events of the 17th of July.

[3] Mine No. 4, belonging to the Mammoth Vein Coal Mining Company, is situated about a quarter of a mile off the road leading from Hartford to Midland. It is about 2½ miles from Midland and about 3 miles from Hartford; Midland being almost north, and Hartford a little to the southwest. Huntington is situated about 5 miles a little north of east of mine No. 4. The towns of Hartford, Huntington, and Midland are mining towns. Practically all the miners living in those towns belong to the union. On the night of the 16th of July there was a meeting of union miners at Frogtown, a village on the road between mine No. 4 and Hartford, and about a mile from the former place. There is no direct testimony as to the purpose of this meeting. That must be inferred from what followed. During the night of the 16th the people living in No. 4 camp, about three-fourths of a mile from mine No. 4, and others living in the vicinity, were notified to leave. Between 3 and 4 o'clock on the morning of the 17th a number of shots were fired into the inclosure of mine No. 4. The employés at that mine were aroused and prepared for an attack. None was made at that time, and most of the employés went back to bed. The train on the Midland Valley Railroad, from Hartford to Ft. Smith, passed mine No. 4 about 7:30 in the morning. Shortly after the passing of the train an attack upon mine No. 4 began. It continued from that time until some time between 12 and 1 o'clock; a continual firing on the mine being kept up during all of that time. The shots were fired from such a distance as to prevent the employés within the inclosure from recognizing the persons who were doing the firing. From the testimony it is clear that several hundred men must have engaged in that attack. Arms were given out to the employés of the mine, and they were stationed at different points. The women and children at the mine were placed between the boilers. After the attack had continued for an hour or more, separate squads of employés endeavored to escape. Levi Brown with his wife and child, John Tony and wife, and Hobson and wife made their way to Prairie Creek, situated about a quarter or a half a mile from the mine, and were directed by certain parties there to take the main road going to Hartford. After proceeding along the road, they were shot at. They then left the road and took to the fields and woods, afterwards coming out upon a road that led to Mansfield. Another party, consisting of six or seven men, endeavored to escape by going in a northerly direction. In this party were Earl Sylesberry, John Baskins, Mike and Ewell Douthit, and a man by the name of Thomas. As they were emerging from a field, they were halted by a band of armed men. Those of the party from the mine that were armed were disarmed, and they were taken prisoners. To their number was added a man by the name of D. S. Stanley, who lived near the mine and was one of those who had been notified to leave during the night before. The reasons for the detention was

that the attacking party supposed that he had given information of their presence to the employés at the mine. This party was taken first to Prairie Creek and afterwards to an abandoned log cabin in the woods half a mile or more from the mine. According to the testimony, they were there turned over to James Slankard, the constable of that township. After they had been held there for an hour or more, a large number of men, estimated by one of the witnesses at between 100 and 200, assembled at this log cabin. The party in the cabin held as prisoners was directed, to come out. When they were assembled on the outside, a man who was unknown to the witnesses, who testified as to the occurrence in this case, drew a pistol and shot Earl Sylesberry twice. John Baskins at this point started to run. The man who had shot Sylesberry then shot Baskins in the back. He then turned and fired another shot into Sylesberry's body, which was lying on the ground. Sylesberry and Baskins were killed. The testimony tends to show that Slankard intervened and directed the man who had done the shooting not to shoot any more. After some little consultation, the other members of the party who had been taken prisoners were directed to leave the country, and were told to make their way over the mountains. They left at once, and scattered in different directions. The Douthit boys made their way to Mansfield, and were there chased and fired upon by persons whom they did not recognize. The testimony tends to show that afterwards the bodies of Baskins and Sylesberry were placed in the log cabin, and it was set on fire. Thomas, one of the parties who had been held prisoner at the cabin, on the following Sunday, in company with the sheriff and the prosecuting attorney, visited the place. Human remains were found among the ashes and burning embers.

Recurring to the attack on the mine. Other employés of the mine continued to leave in squads. Mrs. Sylesberry, the mother of Earl Sylesberry, with three young children, made her way across the fields and woods to Midland. On leaving the mine she was shot at by the attacking parties. S. C. Moore, who was in charge of the mine at the time, left the mine between 11 and 12 o'clock with a party of 25 or 30, including some women and children. They were shot at as they left the mine, but all of them made their escape uninjured. Pat Malloy, with a few others, remained at the mine until between 12 and 1 o'clock. They then made their escape, and during the course of the afternoon reached Mansfield. There was a picnic that day at that place. All of Malloy's party were armed. They went to the express office and left their guns, directing that they should be shipped to Ft. Smith. Malloy and Harmon left the express office, which was at the depot, and went out upon the street. They were set upon by a crowd of men, and Harmon was badly beaten. Malloy ran and was chased by a number of armed men. He made his escape through a cornfield into the woods, where he remained until night. He then came into town with the intention of concealing himself in a box car, and thus getting away. As he approached the railroad track, a party of men fired some shots, and he supposed that they were firing at him. As it turned out they were not, but were firing at one of the

Douthit brothers. Malloy again ran, and during the night secreted himself in a freight car, and was taken east as far as Ola, from which point he made his way to his home at Clarksville. After Malloy and Harmon had left the depot at Mansfield, two other members of their party were attacked and beaten to insensibility. They were rescued through the interposition of W. B. Chilton, the agent at Mansfield. Throughout that entire day not a single arrest was made by any officer of any man among those who made the attack on the mine, or of the man who shot Sylesberry and Baskins, or of those who made the assault at Mansfield. The testimony shows that the news of the attack was telephoned to the different towns in that locality immediately after the attack was made. It was known at Greenwood before 8 o'clock. It was known at Hartford earlier than that. Neither the sheriff at Greenwood nor the deputy sheriff at Hartford appeared upon the scene until about 3 o'clock in the afternoon, at which time the property at No. 4, on the surface, had been burned, or blown up by dynamite, and no member of the attacking party was at that time visible.

All of the mines at Hartford and Huntington were operated by union men. At all of these mines whistles were blown, as usual, for work on the morning of the 17th. No miners appeared at any one of the mines except at No. 3 at Huntington. At that mine men enough appeared to work, and the mine was run for an hour or two, when, without giving a reason for their action, all the miners came out and left.

A subpœna has been issued for James Slankard as a witness in this case. The marshal reports that he cannot be found. He is one of the defendants in this case. The testimony introduced to sustain the charge against him was taken before the 17th of July. The motion to reopen all the cases pending prior to that day, including his case, as heretofore stated, was made, and that motion was overruled, except as to P. R. Stewart. In view of the testimony with reference to the conduct of James Slankard on the 17th of July, that order overruling the motion to reopen the case of James Slankard will be set aside, and the case will be opened as to him.

There can be no doubt that this attack was planned and made by the union men. Attachments were issued after the 17th of July against John Manick, Frank Gripando, Loyd Claborn, Pink Dunn, and George Burnett, for alleged participation in the attack on that day. The charge against Manick is supported by the testimony of Levi Brown. Camp No. 3 is situated about a quarter of a mile south of mine No. 4. It was composed of houses belonging to the Mammoth Vein Coal Mining Company, and occupied by its employés. It was situated about a quarter of a mile from Prairie Creek. John Manick and Frank Gripando, at the time of the shooting, lived at Prairie Creek. John Manick had lived there for a number of years. Gripando had not lived there so long, but had lived there prior to the assault made upon the employés of the coal company on April 6th, and ever since that time. With regard to John Manick, the testimony of Levi Brown is that, in going from mine No. 4 to Prairie Creek, he

saw John Manick at No. 3 camp with a burning board in his hands, and that the buildings in the camp were then in flames. The conclusion from that testimony is that John Manick was at the time engaged in setting fire to the houses of the camp. Manick testifies that he was not engaged in the attack at all, and did not set fire to the houses at No. 3 camp. He stated that he remained at Prairie Creek during the entire time that the attack was made upon the mine, but took no part in the attack. He also introduced two witnesses, B. F. Riley and his wife. Their testimony was that, at the time of the attack, they were living at No. 3 camp, and had lived there from the Sunday previous. They had just come there from the state of Wyoming, and were entire strangers in the community. They did not know John Manick. Mrs. Riley testified that the buildings at No. 3 camp were set on fire, and that she and her husband carried their trunks into an adjacent field, and afterwards they were assisted by some person, whom they did not know, to carry the trunks to Prairie Creek. When they reached Prairie Creek, they saw John Manick there, who, at their request, gave them some water. Mrs. Riley testified that No. 3 camp was on fire between 8 and 9 o'clock, as best she could remember, and that it commenced to burn before she left there. It will be borne in mind that she did not go directly from No. 3 camp to Prairie Creek. Taking the testimony of Riley and wife and the testimony of Levi Brown, the conclusion must be that Brown went to Prairie Creek before Riley and wife did, and that he saw John Manick at camp No. 3 with a fire brand in his hand before Riley and wife saw him at the well at Prairie Creek. It was shown in the testimony that Levi Brown had failed to identify John Manick at Greenwood at the time that the state grand jury, then in session at that place, was making an investigation of the occurrences of July 17th. A number of men, among whom was John Manick, were drawn up in line outside of the grand jury room, and Brown was asked by the grand jury to point out John Manick. He pointed out some person other than Manick. Whatever the circumstance may have been that prevented Brown from recognizing Manick on that day, the fact is that, at the time of giving his testimony in this case, he did recognize John Manick in open court, and pointed him out. Manick's testimony shows that there were about 40 families living at Prairie Creek. It also appears in testimony that on that particular morning there were a number of men about Prairie Creek. All of these persons knew Manick. With the knowledge of his whereabouts on that day so well known, according to his statement, it is a suspicious circumstance that, in proving his alibi, he should select as witnesses two persons who were, up to about 10 o'clock on that day, entire strangers to him, and did not produce persons with whom he was associated every day and who were present on that occasion. I am convinced that the testimony of Levi Brown with reference to John Manick is correct.

Brown also testified that when he went to Prairie Creek on that day he saw Frank Gripando among a number of men, and that Gripando was armed. A number of Italians were introduced who tes-

tified, through an interpreter, that Gripando assisted in conducting a number of women and children to the point of a certain ridge, where they would be out of danger of bullets. Gripando himself testified that he did not participate in the attack. Brown had been at mine No. 4 from the latter part of March, and knew Gripando. I am satisfied that his testimony is true, and that he recognized Gripando with a gun in his hand. He could not have had a gun on that occasion at that place without having the purpose to participate in the attack on the mine, and I am satisfied that he did so.

The testimony against Pink Dunn and George Burnett is that they were seen on the morning of the 17th going in the direction of No. 4 with guns in their hands. Later in the morning they turned back two women who were on their way from Midland to Hartford, stating that a fight was going on at No. 4, and that they could not go that way. When asked if there was not another way that they might go, Burnett replied that there was not, but Pink Dunn said that they could turn into another road a little distance further on, and thus avoid passing mine No. 4. They proceeded a little distance further, but they returned in a few minutes. They did not see either Burnett or Dunn on their return. F. M. Arnold testified that he had started on the morning of the 17th to go from Arkol to Hartford, and that he had been stopped by an armed man and told that he could not go that way. He turned towards Midland and met Pink Dunn and George Burnett and told them that he had been stopped, and that he was present at the time of the conversation between Dunn and Burnett on the one side and the two women on the other. Dunn and Burnett stated that they were union miners, and that they had left Midland about 9 or 10 o'clock, without any knowledge that an attack was being made on No. 4, and that they intended to go to the schoolhouse at Prairie Creek for the purpose of drawing the aid coming to them as union miners out of employment. They stated that their idea in taking their guns along was that they might shoot squirrels on the road.

M. S. Ward testified that about three weeks before the attack he had a conversation with Burnett on the street in Midland, in which conversation reference was made to something about to happen at No. 4 mine. In this conversation Ward said to Burnett, "George, me and you are too old for that. We have done our part, and we cannot afford to have anything to do with that now." To that Ward testified that Burnett replied, "I am going." The fact that an attack was going on was generally known at Midland shortly after it commenced. It is incredible to me that Burnett and Dunn, both of whom are comparatively young men, could be members of the union, living so close to mine No. 4, and not have knowledge of the fact that an attack was going on that late in the morning of July 17th. I cannot believe that they were armed with guns for any other purpose than to participate in that attack. The conclusion, therefore, is that Manick, Gripando, Burnett, and Dunn all took part in the attack of July 17th, with full knowledge of the injunction.

With regard to Loyd Claborn, the testimony on the part of the

prosecution tends to show that he was at Prairie Creek on that morning, and that he was armed. He introduced the testimony of a number of witnesses who accounted for his whereabouts during the entire morning of that day and up until the afternoon, and who testified that for a great portion of that time he was lying sick at his father's house. In the case of Gompers v. Buck Stove & Range Co., 221 U. S. 444, the court said:

"Without deciding what may be the rule in civil contempt, it is certain that, in proceeding for criminal contempt, the defendant is presumed to be innocent; he must be proven guilty beyond a reasonable doubt."

The testimony on behalf of Claborn is sufficient to raise a reasonable doubt in his favor, and he will be discharged. Burris, Robinson, Stewart, Manick, Gripando, Dunn, and Burnett will be adjudged guilty of contempt. The punishment of Burris will be 30 days in jail, of Robinson 60 days in jail, and of Stewart, Manick, Gripando, Dunn, and Burnett 4 months in jail. The place of imprisonment will be the county jail of the Ft. Smith district of Sebastian county, at Ft. Smith, Ark.

[4] It is proper to say, in this connection, that a conviction upon a charge of contempt for an offense which is also a crime does not bar a prosecution for the crime. Merchants' Stock & Grain Co. v. Board of Trade, 201 Fed. 20, 120 C. C. A. 582; U. S. v. Sweeney (C. C.) 95 Fed. 445.