## STEWART v. UNITED STATES.*

(Circuit Court of Appeals, Eighth Circuit.   September 4, 1916.)

Nos. 4440-4443.

1. CONTEMPT ⊜⇒72—PUNISHMENT—CIVIL OR CRIMINAL PROCEEDINGS.
   Where, on consideration of a motion, filed by the complainant in a suit in equity, asking for an attachment for contempt against certain persons for violation of an injunction issued in the suit, the court ordered cases docketed in the name of the United States against the persons charged, which was done, and all further proceedings were conducted under such title and under direction of the district attorney, such proceedings were at law for criminal contempt, and judgment imposing imprisonment on the defendants convicted were appropriate, and within the authority of the court.
   [Ed. Note.—For other cases, see Contempt; Cent. Dig. §§ 249-256, 273; Dec. Dig. ⊜⇒72.]

2. CONTEMPT ⊜⇒66(7)—PROCEEDINGS FOR CRIMINAL CONTEMPT—CONCLUSIVE-NESS OF FINDING.
   In such proceedings, while a finding of guilt must be based on testimony after the analogy of criminal cases, in which the presumption of innocence attends the defendant, and should be pronounced only on evidence which carries conviction beyond a reasonable doubt, nevertheless the judgment of the court is attended by all the conclusiveness of the verdict of a jury, and, if sustained by substantial evidence, will not be lightly set aside.
   [Ed. Note.—For other cases, see Contempt, Cent. Dig. § 237; Dec. Dig. ⊜⇒66(7); Appeal and Error, Cent. Dig. §§ 365, 462.]

3. CONTEMPT ⊜⇒20—ACTS CONSTITUTING CONTEMPT—INCITING TO VIOLATION OF INJUNCTION.
   Language or conduct designed and having the natural effect to incite others to violence in disregard of an injunction, is itself a contempt of the court.
   [Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 58-62; Dec. Dig. ⊜⇒20.]

4. CONTEMPT ⊜⇒60(3)—PROCEEDINGS FOR CRIMINAL CONTEMPT—SUFFICIENCY OF EVIDENCE.
   Findings that defendants in proceedings for criminal contempt were guilty of willful violation of an injunction, and that, although not parties to the injunction, they had full knowledge of the same, held sustained by the evidence.
   [Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 185-187; Dec. Dig. ⊜⇒60(3).]

In Error to the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Proceedings for contempt by the United States against P. R. Stewart, against Pink Dunn, against George Burnett, and against Frank Gripando. Judgments of conviction, and defendants separately bring error. Affirmed.

Covington & Grant, of Ft. Smith, Ark., for plaintiffs in error.
J. V. Bourland, U. S. Atty., of Ft. Smith, Ark.

Before CARLAND, Circuit Judge, and AMIDON and VAN VAL-KENBURGH, District Judges.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied December 4, 1916.

VAN VALKENBURGH, District Judge. April 7, 1914, the Mammoth Vein Coal Mining Company, a corporation organized under the laws of the state of West Virginia, filed in the District Court for the Western District of Arkansas its bill of complaint against one M. Hunter and other defendants, charging that they, with others, had conspired and confederated together to injure and destroy the mines and property of complainant, located in Sebastian county, Ark., and to prevent complainant from caring for said property, and using the necessary means to pump the water from its said mine, so that the same might not be destroyed by an accumulation of water therein, and to prevent complainant from operating said mines, or conducting its business by producing coal therefrom and selling or disposing of the same. Some of the defendants named were said to represent the United Mine Workers of America, still others were alleged to be officials of Sebastian county, Ark., and the remaining defendants were understood to be union mine workers in this district. All were charged with interfering by threats and intimidation with the operation of said mines by complainant through the employment of nonunion miners. April 8, 1914, a temporary restraining order was issued, and, May 9th following, a decree of injunction dismissing the cause as to defendants Hunter, Bumpas, and McMulland, but as to others granting the relief prayed in the following language:

"And it was further considered, ordered, adjudged, and decreed by the court that as to all the other defendants named in the caption hereof, and each of them, and all other persons acting or co-operating with defendants, or conspiring or combining with them, or any person having notice of this order, be and the same are hereby perpetually restrained individually and collectively from interfering with, injuring, obstructing, or stopping by force, threats, or intimidation any of the business of complainant, and from in any manner interfering with the property of complainant, or trespassing upon the same, whether the same is specifically described in this decree or not, which property is generally described in such complaint as Prairie Creek Coal Company mine No. 4, and Mammoth Vein Coal Company mine No. 1, near the town of Midland, in the county of Sebastian, State of Arkansas, and from entering upon any of the grounds or premises occupied by the complainant as aforesaid for the purpose of interfering with the business of complainant, or with the property or employés of complainant, and from compelling by threats and force and violence, or by direct or indirect coercion, any of the present or future employés of complainant from performing their duties as such employés, or in doing any act whatever in furtherance of a design to restrain or prevent, by unlawful conduct, complainant from operating its said mines, and that said defendants, and each of them, and such persons unlawfully associating or conspiring with them, or having knowledge of this order, be further restrained from in any manner unlawfully interfering with any person or persons that the complainant may hereafter bring or cause to be brought to its said mines heretofore referred to, or from encouraging or abetting any person or persons to threaten or coerce, directly or indirectly, any person or persons that may enter or continue in the employment of complainant, and that they and each of them, their confederates, or associates, or persons having knowledge of this order, be enjoined from assembling in or upon the premises of complainant, for the purpose of holding disorderly or riotous meetings, or for the purpose of effecting unlawful interference with employés of complainant, or with its property, and from in any manner damaging or destroying the property of complainant."

None of the defendants herein were named parties to the bill of complaint. June 13, 1914, complainant, through its attorneys, moved the

court for an attachment for contempt against seven individuals, including defendants P. R. Stewart and Frank Gripando, charging them with violating the injunction orders of the court and with conspiring with others so to do. On the same day the court issued its order, the material part of which is in the following language:

"The court being well and sufficiently advised in the premises, it is considered and ordered that a case in the name of the United States against each of said defendants be docketed, and that the marshal of the Western district of Arkansas forthwith apprehend the said Morro Colo, Foster Bean, Sandy Robinson, Blue Johnson, James Slankard, Pete Stewart, and Frank Gripando, and bring them before the court July 1, 1914, at 10 o'clock in the forenoon, then and there to answer the charge of contempt of court for the violation of its decree aforesaid, as it is alleged, for which writs of attachment shall issue."

Motions and orders affecting parties other than those now before the court followed shortly after. Hearings upon these original attachments were held in due course, and on July 14, 1914, the causes were submitted, and by the court taken under advisement. July 17th, an armed mob appeared in the woods near one of complainant's mines, fired at the employés working therein, finally drove them away, and then burned the tipples, houses, office, and other property of complainant, and damaged the mines themselves with dynamite. On the 18th of July thereafter, complainant filed a further motion for attachment for contempt against the defendants Pink Dunn and George Burnett, charging them with aiding and abetting a mob in destroying the property of complainant by acting as guards or pickets for the purpose of preventing aid being taken to the employés of complainant who were besieged in mine No. 4 on the 17th of July, 1914, all in violation of the order of court of May 9, 1914, hereinabove set forth. The court, by its order issued on the same day, directed that a case in the name of the United States be docketed against each of said defendants, and the marshal was directed to bring them before the court forthwith to answer the charge of contempt of court for the violation of its said decree. On July 27th a motion was filed to reopen the contempt proceedings against the defendants Stewart, Gripando, and others, to which objection was lodged. The court, however, sustained this motion as to the defendant Stewart herein, and thereafter further hearings were held; the final submission being made August 25, 1914. September 1st, thereafter, judgment was pronounced, and each of the plaintiffs in error were sentenced to be imprisoned in the Sebastian county jail at Ft. Smith, Ark., for a period of four months, and to pay to the United States the costs of prosecution.

The cases were submitted together upon a single printed record. The main contentions for the defense are: (1) That the proceedings were, in fact, in the original cause in equity brought by the Mammoth Vein Coal Company and prosecuted by it; that it was not a proceeding for the benefit of the public, nor one in which the public, the government, or the court were concerned. (2) That, in any event, the evidence was insufficient to sustain a conviction.

[1] In Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, the Supreme Court

makes clear the distinction between civil and criminal contempt. It is there said:

"Contempts are neither wholly civil nor altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.' Bessette v. Conkey, 194 U. S. 329 [24 Sup. Ct. 665, 48 L. Ed. 997]. But in either event, and whether the proceedings be civil or criminal, there must be an allegation that in contempt of court the defendant has disobeyed the order, and a prayer that he be attached and punished therefor. It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. * * * But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial, by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order. * * * On the other hand, if the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. Imprisonment cannot undo or remedy what has been done, nor afford any compensation for the pecuniary injury caused by the disobedience. * * * Such imprisonment operates, not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience. It is true that either form of imprisonment has also an incidental effect; for if the case is civil, and the punishment is purely remedial, there is also a vindication of the court's authority. On the other hand, if the proceeding is for criminal contempt, and the imprisonment is solely punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent a repetition of the disobedience. But such indirect consequences will not change imprisonment, which is merely coercive and remedial, into that which is solely punitive in character, or vice versa. * * * The distinction between refusing to do an act commanded, remedied by imprisonment until the party performs the required act, and doing an act forbidden, punished by imprisonment for a definite term, is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment."

Viewed in the light of this pronouncement, the classification of the case at bar is not difficult. The disobedience complained of was a thing accomplished, and consisted in doing that which the defendants had been commanded not to do, according to the motion for attachment. The only possible remedial relief for such disobedience would have been to impose a fine for the use of complainant, measured in some degree by the pecuniary injury caused by the act of disobedience. Gompers v. Bucks Stove & Range Co., supra. If, therefore, these cases were in fact proceedings in the original cause in equity, were intended to be primarily remedial in their nature and for the benefit of the complainant, instead of for the vindication of the court's authority, the judgment of imprisonment was without authority.

In Gompers v. Bucks Stove & Range Co., supra, the court held that that proceeding was for civil contempt, and pointed out a number of things as unavoidably so fixing the status of that case:

(1) The contempt proceeding was entitled, in the main cause, "Bucks Stove & Range Company, Plaintiff, v. American Federation of Labor et al., Defendants, No. 27,305, Equity."

(2) The answers of the defendants, every report by the examiner in chancery, every deposition, motion, and stipulation, every order, including the final decree and the amended decree, were all uniformly entitled in the equity cause.

(3) All the testimony, oral and written, was, by reference in the petition, made a part of the contempt proceedings.

(4) The trial judge quoted largely therefrom, and was evidently largely influenced by this evidence, which disclosed the great damage done to the complainant's business before the injunction issued.

(5) It was moved by the stove and range company, and adjudged by the court, that the complainant recover against the defendants its costs in said contempt proceeding.

(6) The complainant made each of the defendants a witness for the company, and, as such, each was required to testify against himself; a thing most unlikely, if either party had regarded the proceeding one at law for criminal contempt.

(7) The petitioner prayed for such other and further relief as the nature of *its* case might require, which was held to be equivalent to a prayer for remedial relief.

(8) The Bucks Stove & Range Company was not only the nominal, but the actual, party on the one side, with the defendants on the other. It acted throughout as complainant in charge of the litigation. As such, and through its counsel, acting in its name, it made consents, waivers, and stipulations only proper on the theory that it was proceeding in its own right in an equity cause, and not as a representative of the United States, prosecuting a case of criminal contempt. It appeared in the Supreme Court as the sole party in opposition to the defendants; and its counsel, in its name, filed briefs and made arguments in that court in favoring affirmance of the judgment of the court below.

In the case at bar none of the foregoing features are present. It is true that the motions for attachment were entitled in the equity case and were filed by counsel for complainant; but inasmuch as there must be an allegation that in contempt of court a defendant has disobeyed a specific order, it is but natural, and without further significance, that the motion should be made in the case in which that order was entered, and further that it should be called to the attention of the court by some party interested in the maintenance of that order. The complainant might well have brought the disobedience complained of to the attention of the court, without compromising the nature of any subsequent procedure that might be instituted. United States v. Wayne, Fed. Cas. No. 16,654. The court, however, immediately considered and ordered that the case be docketed in the name of the United States. To the marshal was confided the execution of the writs. The cases were so entitled, and throughout the record this relationship has been preserved in fact, as well as in name. Under this title the defendants Stewart and Gripando filed answer. On behalf of Dunn and Burnett no formal answer appears. Objections to reopening the case before the trial judge were entitled "United States v. P. R. Stewart et al." It is further true that counsel for complainant appeared with the United States attorney and took a prominent part in the examination of witnesses at the hearing. Nevertheless, the cases were distinctly under

the control and jurisdiction of the latter, and in this court the brief is filed by the district attorney alone. Neither in the original motions nor subsequently did the complainant pray for relief of any character, whether directly or indirectly. Costs were neither asked nor awarded in its behalf. It was the evident purpose of court and parties to treat these cases as for criminal contempt to vindicate the authority of the court. No other purpose appears either in substance or in form. In Gompers v. Bucks Stove & Range Company, the court recognized the right and power of the Supreme Court of the District of Columbia to punish by a proper proceeding the contempt, if any, committed against it upon the facts disclosed in that case, and remanded the cause without prejudice to that power and right, if exercised in a proper proceeding. Had such been done, the procedure would not have differed substantially from that adopted in the present case. We are of opinion, therefore, that these cases are proceedings at law for criminal contempt, and that the judgments rendered conform to the requirements of such proceedings.

[2] It remains to consider whether the evidence is sufficient to sustain the convictions. While these actions are not for contempt committed in the presence of the court, but to vindicate the authority of the court and to punish a disobedience of its orders, requiring a finding of guilt upon testimony, after the analogy of criminal cases, in which the presumption of innocence attends the defendant, and guilt should be pronounced only upon evidence which carries conviction beyond a reasonable doubt, nevertheless the judgment of the court is attended by all the conclusiveness of a verdict by a jury, and, if sustained by substantial evidence, will not be lightly set aside.

[3, 4] The defendant Stewart is charged with having aided and abetted in the violation of the injunction by incendiary language and speeches, indulged in for the purpose of inciting an attack upon the employés and property of complainant, culminating in that of July 17th, to which reference has been made. That language or conduct designed, and having the natural effect, to incite others to violence in disregard of the orders of the court, is itself a contemptuous act, is well recognized. United States v. Debs et al. (C. C.) 64 Fed. 724; In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; United States v. Haggerty et al. (C. C.) 116 Fed. 510; United States v. Gehr (C. C.) 116 Fed. 520. This defendant was district president of the United Mine Workers of America, and the language used was calculated to inflame the membership of that order and to lead to the acts of violence which, in point of fact resulted. United States v. Weber (C. C.) 114 Fed. 950. There was evidence that Stewart stated that all of the men who wanted guns could get them; that there would be another Colorado trouble, and that, rather than see the mines work open shop, he would go out and die himself; that he and his associates did not aim to let the mine be operated with nonunion labor; that the union men would prevent it. Upon being reminded that the court had granted an injunction, Stewart said:

"Damn the injunction. The national government is against us, but the people are with us, and we don't aim to let them dig coal."

A number of witnesses testified to his statements, that arms were available to those that wanted them. The witnesses do not all agree as to the exact language used on the several occasions named, and Stewart himself denies part of the statements charged, and couples an explanation of others with an assertion of innocent intent. However, a patient and careful reading of the record discloses ample to sustain the finding and judgment of the court.

Dunn and Burnett were charged with having acted as guards, on one of the roads leading to the mines, for the purpose of intercepting passers-by and preventing interference with the assault upon complainant's property and employés. Their presence there with guns is not denied. Their act in turning people back is admitted. The explanation made was not credited by the court, and we find in its decision, upon testimony adduced, no abuse of judicial discretion.

Frank Gripando was charged with active participation in the battle. The witness Brown positively identifies him as one of an armed group from which shots were fired. This was between 10 and 11 o'clock in the forenoon. The defendant himself and some of his neighbors say that he and they went to the woods with their families while the shooting was in progress. Their answers to these critical questions were almost stereotyped. The time fixed by these witnesses was not clearly defined, but the impression conveyed was that they, including this defendant, spent practically the entire day thus in hiding. Great reliance is placed by the defense upon the witness Riley, a nonunion miner, who also found his way to these same woods behind the hill. An examination of Riley's testimony does not corroborate that of the other witnesses, nor bear the interpretation placed upon it by defendant's counsel. He says:

"A. I don't remember of seeing him but one time that day. Q. When was that? A. It was near along in the neighborhood of 1 o'clock. Q. Where was it? A. He was gone out on the hill for his family, his wife and children. Q. Did he bring them back with him? A. Yes, sir. I judge it was somewhere near 1."

This was not at all inconsistent with the testimony of Brown, who says he saw him armed and a part of the attacking mob between 10 and 11 o'clock. It also serves to explain the testimony of Gripando's friends, Faleno, Lavaino, and the Salas. The defendant, who took the stand in his own behalf, testified that:

"As soon as I heard the shots, I got out, and took my family, and went out in the woods."

This phraseology is similar to that of his other witnesses, with the exception of Riley. Later, upon cross-examination, he admitted that he had neither wife nor children, but boarded with a woman who kept a boarding house. The court resolved this testimony against the defendant, and, in so doing, we think it is sustained by the record.

None of these defendants were parties to the original proceeding for injunction, and the rule is invoked that, in order to charge such a person with contempt, he must have had actual notice of the injunction prior to the performance of the acts upon which the charge of contempt is based. He cannot be charged with contempt, unless a copy of the in-

junction was served upon him, or it is proved that he had knowledge of its provisions (citing Garrigan v. United States, 163 Fed. 16, 89 C. C. A. 494, 23 L. R. A. [N. S.] 1295). The point thus raised has application only to the defendants Gripando and Burnett. Both Stewart and Dunn are conceded to have had knowledge of the injunction and its provisions. In the case last cited, the finding that the plaintiffs in error had "full knowledge of the injunction" rested alone on the alleged publicity of the issuance, through newspapers, and notices thereof which were posted on the wagons intercepted by the mob. The court said:

"The mere inference of 'full knowledge,' derived solely from the above-mentioned facts, is without force, as we believe, to overcome the express denial of knowledge on the part of the accused, fortified by the presumption [of innocence] thus defined."

Also, in that case:

"No proof appears that the plaintiff in error was engaged by or with any person or association enjoined in its violation."

This contention is thus met by the United States attorney in his brief:

"The record shows the locus and broad extent of the controversy out of which the injunction grew; it shows the general and generous posting of printed copies of the injunction by the United States marshal; it shows that Gripando, Burnett, and Dunn, union miners, all lived in the community in which the original controversy and it sequential events were staged, in which, indeed, the said notices were profusely posted. The record shows, moreover, that, although all these defendants were witnesses in their own behalf, not one of them pleaded ignorance or want of notice of the injunction."

In our opinion, the facts in the instant case clearly distinguish it from that before the Court of Appeals for the Seventh Circuit, and met the demands of the rule requiring notice and knowledge on the part of a stranger to the original proceeding.

On behalf of Stewart it is urged that the court erred in reopening the case against him after the happenings of July 17th. This hearing was before the court and the case undecided at the time the motion to reopen was filed. While the proceeding is criminal in its nature, it is not attended by such strict formality as obtains in the trial of ordinary criminal cases before juries. So long as the right to be confronted by witnesses, to cross-examine, to offer evidence in his own behalf, and, in general, to avail himself of every element of defense, was not denied—and no complaint is made on that score—we cannot see that the defendant was deprived of any substantial right in the reopening of his case for further hearing.

Because of the importance of these cases, in the view of the court, as well as of the parties, and because of an earnest desire that no injustice should be done through inadvertence or otherwise, the decision of these cases has been deferred for an unusual time, in order that all members of the court might have opportunity to give the record and briefs most careful scrutiny and consideration. The result is as stated above. The trial judge evidently approached this hearing in that spirit of dispassionate fairness which is characteristic of him. Of those cited, a number who were convicted have prosecuted no appeal. Others were discharged by the court at the conclusion of their hearings. The orig-

inal charge against the defendant Gripando was dismissed by the court upon its own motion. The cases presented appear to have been considered and adjudged with much care and discrimination. The learned trial judge had all the witnesses before him, and was able to note their demeanor on the stand. He could determine their credibility and the weight to be given to their testimony far more accurately than this court can do from the printed record alone. Since, then, there is substantial evidence to support his findings, we find warrant neither in law nor in fact to reverse his decision.

It follows that the judgments must accordingly be affirmed.