The UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony Paul MINERICH, Defendant-Appellant.

No. 12005.

United States Court of Appeals,
Seventh Circuit.

Dec. 5, 1957.

Rehearing Denied Jan. 29, 1958.

Irving G. Steinberg, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., John H. Bickley, Jr., Edwin A. Strugala, Asst. U. S. Attys., Chicago, Ill., of counsel, for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and HASTINGS, Circuit Judges.

FINNEGAN, Circuit Judge.

Several major aspects of denaturalization problems emerge in sharp relief through questions raised by respondent Minerich's appeal from the decree, entered below, November 9, 1956, which set aside an earlier order admitting him to citizenship on March 19, 1928. Twelve witnesses gave evidence for the United States in the denaturalization proceedings and Minerich, without testifying, rested on his defense consisting primarily of attempts to undercut the credibility of government witnesses through cross-examination of them by defense counsel. The case was tried by the district judge without a jury, and he considered that the allegations of the government's petition were proved. We disagree.

However, before reaching the findings of fact and conclusions of law underlying the challenged decree we must examine the government's affidavit, filed in obedience to the mandate of § 340 of the Immigration and Nationality Act of 1952, 66 Stat. 163, 8 U.S.C.A. § 1451(a), since Minerich attacks that affidavit [1] with

1. "Reuben Speiser, being duly sworn, deposes and says:

"1. That he is an Attorney, Immigration and Naturalization Service, United States Department of Justice, and as such has access to the official records of the said Service, from which the following facts appear:

"(a) That Anthony Paul Minerich filed a petition for naturalization in the United States District Court for the Western District of Pennsylvania on December 9, 1927, and was admitted to citizenship by that court on March 19, 1928, receiving naturalization certificate No. 2819219.

"(b) In his petition for naturalization the said Minerich alleged under oath:

"(7) I am not a disbeliever in or opposed to organized government or a member of or affiliated with any organization or body of persons teaching disbelief in or opposed to organized government. * * * I am attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It is my intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to Alexander I King of the Serbs, Croats, and Slovenes, of whom (which) at this time I am a subject (or citizen), and it is my intention to reside permanently in the United States."

"(c) That the allegations of said Minerich as set forth in the preceding sub-paragraph were false and untrue, as more particularly appears in the following sub-paragraphs.

"(d) That after the filing of his petition for naturalization and before the date of his admission to citizenship, the said Anthony Paul Minerich was arrested and charged:

"(I) on or about February 1, 1928, for disorderly conduct at a meeting of the Penn-Ohio Relief Organization, at at McDonald, Washington County, Pennsylvania, in that he used boisterous and unseemly language, and stated, among other things: 'To hell with injunctions;' and

"(II) on or about February 17, 1928, for conspiracy to violate, and acts in violation of an injunction issued by the United States District Court for the Southern District of Ohio, Eastern Division, including such statements as: 'The way to win this strike is to have a real picket line and violate the damnable injunction.' As a result, the said Minerch was convicted on March 2, 1928 of contempt of court and sentenced to impris-

ideas culled from United States v. Zucca, 1956, 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964. Rather than yielding firmly particularized criteria for testing § 340 affidavits, Zucca exhibits judicial reiteration of the Congressional directive in answer to the government's failure to file any affidavit when denaturalization proceedings were commenced against Zucca. The Zucca holding prohibits the substitution of a sworn complaint for an affidavit on this theory: "The complaint * * * is required merely to allege ultimate facts while the affidavit must set forth evidentiary matters showing good cause for cancellation of citizenship." 351 U.S. 91, 99, 76 S.Ct. 671, 676. What is now ripe for our consideration arises out of

onment for a period of 45 days, which judgment of conviction and sentence were affirmed on appeal.

"(e) That at the final hearing in his petition for naturalization on March 19, 1928, the said Anthony Paul Minerich failed to disclose to the naturalization examiner in attendance, to the clerk of the court, or to the presiding judge that, since the filing of his petition, he had been arrested, or charged with the violation of any law, or convicted thereof.

"(f) That during the period 1926 to 1928 inclusive, the said Minerich was a member of the Communist Party of the United States as well as other organizations and groups affiliated with the Communist Party.

"(g) That the Communist Party of the United States was an organization which, during the period 1926 to 1928, inclusive:

"I. Advised, advocated, or taught the overthrow by force or violence of the government of the United States;

"II. Advised, advocated, or taught the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers of the government of the United States because of his or their official character;

"III. Advised, advocated, or taught the unlawful damage, injury, or destruction of property;

"IV. Advised, advocated or taught sabotage;

"V. Wrote, circulated, distributed, printed, published, or displayed, or caused to be written, circulated, distributed, printed, published, or displayed or had in its possession for the purpose of circulation, distribution, publication, issuing, or display, written and printed matter which advised, advocated, or taught the performance of the acts described in subparagraphs 1(g), I, II, III, and IV;

"VI. Promoted, influenced, and advanced the political activities, public relations, and public policy of the Union of Soviet Socialist Republics.

"(h) That at all of the times above mentioned, the Communist Party of the United States was a section of the Communist International, an organization whose principal officers were citizens or subjects of foreign countries and the principal offices of which were situated in Moscow, in the Union of Soviet Socialist Republics; that decisions made by such organization were binding upon other Communist parties, including the Communist Party of the United States and the individual members thereof, whether such decisions were contrary to the laws of the United States or not.

"(i) That in the course of the naturalization proceeding, the said Minerich failed to disclose to the naturalization examiner or the naturalization court that he was then and had been a member of the Communist Party, although he knew that the Communist Party was an organization which engaged in the activities set forth in subparagraph 1(g).

"(j) That the said Minerich deliberately and intentionally concealed the facts relating to his police record and affiliation with the Communist Party, as set forth in the preceding subparagraphs, in order to prevent the making of a full and proper investigation of his qualifications for citizenship; to conceal his lack of attachment to the principles of the Constitution; to induce the naturalization examiner to make an unconditional recommendation to the court that his petition be granted; to preclude inquiry by the court concerning his qualifications for citizenship; and to procure naturalization in violation of law.

"2. That the naturalization of said Minerich was illegally and fraudulently procured in that:

"(a) He was not a person of good moral character during the period required by law inasmuch as he had willfully and deliberately concealed from the naturalization court the facts relating to his police record and affiliation with the Communist Party.

"(b) He was not attached to the principles of the Constitution and well disposed to the good order and happiness of the United States during the period required by law inasmuch as he had been a member of and active in the affairs of the Communist Party of the United States which, to his knowledge, had en-

the relationship between the content[2] of such affidavit and the Zucca precept that a § 340 affidavit showing good cause is a procedural prerequisite to the initiation of proceedings under the following provision of the Act:

(a) It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 310 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturaliza-

tion on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively: *Provided,* That refusal on the part of a naturalized citizen within a period of ten years following his naturalization to testify as a witness in any proceeding before a congressional committee concerning his subversive activities, in a case where such person has been convicted of contempt for such re-

gaged in activities as set forth in subparagraph 1(g).

"(c) That he deliberately and intentionally concealed the facts relating to his police record and affiliation with the Communist Party, as more particularly set forth in paragraph 1 for the purpose of deceiving the naturalization court and procuring naturalization in violation of law.

"(d) That he did not intend in good faith to support the Constitution of the United States, to renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign state or sovereignty, and to bear true faith and allegiance to the United States, inasmuch as he intended to and did retain allegiance to the Communist International and the Union or Soviet Socialist Republics.

"3. That good cause exists for the institution of a suit under Section 338(a) of the Nationality Act of 1940 (8 U.S.C. 738(a) to set aside and cancel the naturalization of said Anthony Paul Minerich as having been illegally and fraudulently procured.

"4. That the last known place of residence of said Anthony Paul Minerich is 4808 Lytle Street, Pittsburgh, Pennsylvania.

"Reuben Speiser, *Attorney*

"Subscribed and sworn to at Washington in the District of Columbia this 6th day of November, 1951, before me, the Assistant General Counsel of the Immigration and Naturalization Service, United States Department of Justice, authorized by Section 60–2 of Title 8 of

the Code of Federal Regulations to administer oaths.

"Alber E. Reitzel,
*Assistant General Counsel.*"

We notice the above affidavit was sworn to in 1951 and contains language similar to that found in statutes operative before the enactment of the Immigration and Nationality Act of 1952. The Minerich proceedings were commenced by filing the Petition for denaturalization in the district court on January 9, 1953. We considered the date of this affidavit when deciding the question of "good cause."

2. Several courts recently studied problems involving the content of § 340 affidavits. But with most of these decisions in an unsettled state we prefer to collect them in this note, rather than citing them in our text. See e. g. Nowak v. United States, 6 Cir., 1956, 238 F. 2d 282, certiorari granted 1957, 353 U.S. 922, 77 S.Ct. 679, 1 L.Ed.2d 719; Nowak is doc. No. 72, Oct. Term 1957 and its companion case (Maisenberg v. United States, 353 U.S. 922, 77 S.Ct. 680, 1 L.Ed.2d 719) is doc. No. 76, Oct. Term 1957; United States v. Costello, 2 Cir., 1957, 247 F.2d 384, reversing D.C.N.Y.1957, 145 F.Supp. 892; United States v. Matles, 2 Cir., 1957, 247 F.2d 378 and United States v. Lucchese, 2 Cir., 1957, 247 F.2d 123, both docketed in the Supreme Court (Nos. 378 and 450, respectively) and pending on applications for writs of certiorari.

United States v. Chandler, D.C.Md. 1956, 142 F.Supp. 557 is a relevant but apparently unreviewed district court decision. See also United States v. Anastasio, 3 Cir., 1955, 226 F.2d 912.

fusal, shall be held to constitute a ground for revocation of such person's naturalization under this subsection as having been procured by concealment of a material fact or by willful misrepresentation. If the naturalized citizen does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence."

Though the slippery phrase "good cause" is the statutory benchmark for surveying such affidavits it was left unexamined by the Zucca court, beyond the lines quoted above, and a marginal notation citing United States v. Richmond, 3 Cir., 1927, 17 F.2d 28, and United States v. Salomon, 5 Cir., 1916, 231 F. 928, 929.

The Richmond opinion is interlaced with extensive quotations from United States v. Salomon, supra, where neither the petition nor the affidavit upon which it was based charged the commission of any fraud. When affirming dismissal of the denaturalization proceedings against Salomon, the Fifth Circuit regarded "The remedy given by the statute [then 2 U.S.Comp.Stat.1913, § 4374, now 8 U.S. C.A. § 1451] [as] the means provided for protecting the right of the government to contest applications for naturalization and for excluding from citizenship those who, under the law, are not entitled to the privilege," and commenting further said: "The statute does not indicate a purpose to give the remedy when there has been no injury. The district attorneys are authorized to institute the proceedings only 'upon affidavit showing good cause therefor.' The affidavit upon which this suit was instituted amounted to nothing more than an assignment of error of law apparent upon the face of the naturalization proceedings. It states no fact from which it may be inferred that a ground for contesting the application existed, or that the result might

have been different if all the requirements of the statute had been complied with in the naturalization proceedings. It cannot be supposed that it was in the contemplation of the lawmakers that an affidavit would be sufficient to put upon the district attorney the duty of instituting the proceeding provided for if it showed no more than this one discloses. We think it is manifest that it was intended that the required affidavit should state facts constituting 'good cause' for instituting the proceeding, and should do more than point out errors of law in the procedure which led up to the naturalization. The conclusion is that the statutory remedy would be perverted from its obvious purpose of safeguarding things of substance, if it is permitted to be successfully resorted to without any showing that the issue of the attacked certificate of citizenship might properly have been denied at the time it was granted, if the procedure had been a strict compliance with all statutory requirements."

The proposition which the government, in these denaturalization cases, desires to prove is that citizenship was, at an earlier date, procured under circumstances described in § 340 authorizing annulment of the order admitting an alien to citizenship. The affidavit, then, should reveal facts offered to establish that proposition. See, e. g., I Wigmore § 2 (3rd ed. 1940). This simply means disclosing some of the premises from which the conclusion is drawn, by the United States attorney, that § 340 proceedings are warranted. From such an affidavit an experienced judge should be able to detect a United States attorney's reckless categorization or noncritical selection of candidates for denaturalization, and we think that is all Congress intended by the procedural safeguard. Certainly a pre-trial preview of the complete array of evidentiary facts which the government intends to establish through evidence, parol and documentary, at the trial is far in excess of the showing called for by Congress. We

think the concept [3] "good cause" entails more than the nature and quality of the evidentiary facts arranged in § 340 affidavits. Experience exposes the fallacy of certainty in ordinary human affairs and leads to the practical usefulness of the "good cause" criterion. These affidavits are the means by which courts can ascertain whether the United States Attorney's conclusion about instituting denaturalization proceedings dictated what the reasoning ought to be, in contradistinction from an affidavit showing the basis for reasoning which determined what his conclusion in that regard shall be. It is in this aspect that the affidavit filed below meets the statutory test of "good cause." It is unnecessary that an affiant exhibit personal knowledge of each atomic fact he reads in the Service's files. In daily affairs men constantly rely on unverified judgments yet in so doing act with good cause. After all, the acid test of verification is available to both sides during the denaturalization proceeding.

Having given effect to what we think was the Congressional aim in mandating "good cause" as the standard for § 340 affidavits, and thus resolving the procedural aspect of this appeal, the merits become the focal point. During our study of this record we were mindful of the passage from Klapprott v. United States, 1949, 335 U.S. 601, 612, 69 S.Ct. 384, 389, 93 L.Ed. 266 written by Justice Black when announcing the judgment of a divided court:

> "Furthermore, because of the grave consequences incident to denaturalization proceedings we have held that a burden rests on the Government to prove its charges in such cases by clear, unequivocal and convincing evidence which does not leave the issue in doubt. * * * This burden is substantially identical with that required in criminal cases—proof beyond a reasonable doubt."

On the other hand that view expressed by the Klapprott majority cannot stand in isolation for earlier, a majority of the court speaking through Mr. Justice Murphy had pointed out in Schneiderman v. United States, 1943, 320 U.S. 118, 160, 63 S.Ct. 1333, 1353, 87 L.Ed. 1796 inter alia, that: "A denaturalization suit is not a criminal proceeding. But neither is it an ordinary civil action since it involves an important adjudication of status." If the Federal Rules of Civil Procedure are applicable to these proceedings, and we think they are, then that part of Rule 52, 28 U.S.C.A., providing, "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses" must require a different reading, than usual, because when delivering the court's opinion reported as Knauer v. United States, 1946, 328 U.S. 654, 656, 66 S.Ct. 1304, 1306, 90 L.Ed. 1500, Mr. Justice Douglas informed us that: "When denaturalization is sought * * * the standard of proof required is strict. We do not accept even concurrent findings of two lower courts as conclusive. * * * We re-examine the facts to determine whether the United States has carried its burden of proving by 'clear, unequivocal, and convincing' evidence, which does not leave 'the issue in doubt,' that the citizen who is sought to be restored to the status of an alien obtained his naturalization certificate illegally. * * * " Following the clear direction of Schneiderman, Klapprott, and Knauer, we made an independent appraisal of the plaintiff's evidence presented on the issues of fraud and misrepresentation and found that the government's proof failed. Some aspects of the evidence presented by the plaintiff to show that the order, dated March 19, 1928, admitting Minerich to citizenship was procured by concealment of a material fact and willful misrepresentation are, in chronological order, the following:

3. We discussed the concept of "probable cause" and "reasonable grounds" in our

opinion reported as United States v. Walker, 7 Cir., 1957, 246 F.2d 519.

May 27, 1903   —Minerich born in Dragdlich, Austria.

July 29, 1905   —Arrived at the port of New York.

April 4, 1923   —Filed Declaration of Intention (No. 9646; No. 809869) to become a citizen in the Common Pleas Court of Westmoreland County, Pennsylvania.

March, 1926   —Minerich placed at closed Communist Party meetings in the district headquarters of the Communist Party of New York, by plaintiff's witness Malkin. He also placed Minerich in closed meetings on several occasions during 1927, 1928, 1931, 1932, 1933, 1934 and 1935.

December 9, 1927—Petition (Nos. 2774; 77263) for Naturalization showing birthplace as Dragalic, JugoSlavia, and his then current residence as Greensburg, Pennsylvania. Testified before the Naturalization examiners.

February 1, 1928—Report of Minerich's arrest No. D-19569, McDonald County, Washington, Pennsylvania, charged with disorderly conduct. See also: Arrest record— docket book, plaintiff's Exhibit 3 re file No. 2774-P-77263.

February 2, 1928—Discharged.

February 17, 1928—Minerich addressed meetings of the United Mine Workers of America and their sympathizers at Dillonvale and Yorkville, in Jefferson County, Ohio. The criminal information alleged that 300–400 persons (Union members and sympathizers) were present at the first meeting and 200 members of the United Mine Workers in attendance at the second place of meeting.

February 20, 1928—Minerich arrested and charged with committing acts in violation of an injunction issued by the U. S. District Court, Southern District of Ohio, Eastern Division. The criminal information, referred to above, was filed this date in the United States District Court, Southern District of Ohio. From the certified copy of the docket entries it appears Minerich was also arraigned on this day. During the proceedings below, in the case now before us the following colloquy took place:

"Mr. Bickley: [Assistant U. S. Attorney] You are stating for the record here, 'suppose I told you, Mr. Minerich was arrested on February 28? Are you admitting that on the 28th?

"Mr. Steinberg: [Counsel for Minerich] Yes, on February 28th, I am not denying the arrests. The arrests were introduced, and *we are admitting them,* and in fact we are proud of them, that a man should be arrested in a cause like this.

"There were senators and other people of National repute who were interested in the coal miners' strike in those days." I, Plaintiff's Appendix, 258.

March 2, 1928 —"Defendant found guilty (of contempt), sentenced to 45 days *Licking County Jail, stay of execution until March 5, 1928."* On that date notice of appeal was filed. The opinion reported as Minerich v. United States, 6 Cir., 1928, 29 F.2d 565, shows a sentence of "90 days in jail."

March 19, 1928 —Final hearing on petition for naturalization. In this connection see plaintiff's Exhibit No. 1—Investigation Examiner's Brief.

The duplicate copy of the certificate of Naturalization (No. 2819219) issued to Minerich by the United States District Court, Western District of Pennsylvania, states: "the court having found that the petitioner * * * had in all respects complied with the Naturalization Laws of the United States, and that he was entitled to be so admitted, it was thereupon ordered by the said court that he be admitted as a citizen * * *."

Immediately before his admission to citizenship, on this date, Minerich alleged:

"a. That he was attached to the Principles of the Constitution of the United States and was a person of good moral character and that he would support and defend the Constitution and laws of the United States against all enemies both foreign and domestic.

"b. That he would bear through [sic] faith and allegiance to the United States of America, and that he took his oath of allegiance freely, without any mental reservation or purpose of evasion."

March, 1928 —3, The Labor Defender, 61 published photograph of Minerich with caption "Tony Minerich Outstanding Leader of The Militant Striking Miners of Penn."

December 7, 1928 —Opinion of the Sixth Circuit reported as Minerich v. United States, 29 F.2d 565, 566, certiorari denied 279 U.S. 843, 49 S.Ct. 264, 73 L.Ed. 989, affirming order convicting and punishing Minerich for contempt of an equity injunction preventing unlawful interference by strikers with the operation of a certain coal mine.

In this opinion, the Court noted that Minerich "appearing by counsel * * * undertook to plead that he was guilty of doing the acts alleged, but not guilty of contempt." 29 F.2d 565.

The Minerich opinion also points up that the criminal information showed that he violated the District Court injunction by "* * * addressing a meeting of strikers and urging them to violate the injunction" and that the proof was that Minerich "* * * said to one or the other, or both, of two meetings held in the same locality on the same day—'If the injunction says two pickets put on two hundred pickets. If two hundred pickets is not enough put on two thousand pickets. You will never get any place this way. The way to win this

strike is to have a real picket line and violate the damnable injunction.' There is no suggestion that there was any other injunction about which defendant could have been talking save this one. He thus confesses knowledge of it." 29 F.2d at page 566.[4]

April 3, 1929 —Final Commitment of Minerich to jail under contempt conviction.

There is evidence in this record that from sometime in the latter part of 1925 to and including 1950, Minerich was a supporter and worker for the World Communist Movement and held active membership in the Workers (Communist) Party known later as the Communist Party of the United States.

In support of its case the government called the witnesses Throckmorton and Ilderton, who were naturalization examiners [5] at the time Minerich was processed under the 1906 Act provisions. Both testified they questioned Minerich while he was under oath and that at the preliminary examination [6] he stated that he had never been arrested and was neither an anarchist, nor a Communist and he believed in the organized government of the United States. But the crucial point, and which the government in its brief squarely recognizes is that: "It is quite true that at the time Mr. Minerich was asked these questions, he had not been arrested * * *." (Brief for appellee, p. 12).

■■ Consequently plaintiff reasons that Minerich had a duty to disclose his arrest and conviction, in Ohio seventeen days before naturalization, in Pennsylvania to the latter court and, having failed to reveal, what are now uncontested facts of arrests, manifested a lack of "good moral character" required by the statute operating in 1928. This reasoning would be good if it gives a true con-

4. Compare this statement with that made by the defendant district president of the United Mine Workers of America in Stewart v. United States, 8 Cir., 1916, 236 F. 838, 843; "Damn the injunction. The national government is against us, but the people are with us, and we don't aim to let them dig coal." Here the court, affirming Stewart's conviction for contempt said: " * * * language or conduct designed, and having the natural effect, to incite others to violence in disregard of the orders of the court, is itself a contemptuous act. * * *" Id., at page 843.

5. Government Exhibit 2A is the petition for naturalization filed by Anthony Paul Minerich on December 9, 1927, the seventh clause of which is as follows:

"I am not a disbeliever in or opposed to organized government or a member of or affiliated with an organization or body of persons teaching disbelief in or opposed to organized government. I am not a believer in the practice of polygamy. I am attached to the principles of the Constitution of the United States, and it is my intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Alexander I King of The Serbs, Croats and Slovenes, of whom at this time I am a subject, and it is my intention to reside permanently in the United States."

In a marginal note to the Court's opinion reported as Knauer v. United States, 1946, 328 U.S. 654, 657, 66 S.Ct. 1304, 1306, 90 L.Ed. 1500, it is stated that: "Since 1795 an alien seeking admission to citizenship in this country has been required to swear that he renounced allegiance to all foreign powers, including his native land. 1 Stat. 103, 414; 2 Stat. 153, 154; R.S. § 2165; 34 Stat. 596, 598; 54 Stat. 1137, 1157."

6. "Sec. 7. That no person who disbelieves in or who is opposed to organized government, or who is a member of or affiliated with any organization entertaining and teaching such disbelief in or opposition to organized government, or who advocates or teaches the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the Government of the United States, or of any other organized government, because of his, or their official character, or who is a polygamist, shall be naturalized or be made a citizen of the United States." 34 Stat. 596, 598.

clusion from true premises, and not otherwise. But the duty [7] to disclose is an element in the premise and that is unestablished. United States v. Palmeri, D.C.N.Y.1943, 52 Supp. 226, 227, heavily relied on by the government, is an instance where a defendant did not reveal anything "about his arrest of May 28, 1941, on June 16, 1941, when he appeared for final hearing * * * [because] nobody asked him anything about it, and that he was very happy to complete his naturalization process on that date and obtain the * * * Certificate." Rejecting Palmeri's defense, the district court said: "The failure to disclose the arrest was the failure to perform a duty which the applicant owed to the court, and it was that failure which led the court to grant the petition; thus the defendant revealed a lack of the good moral character which it was his duty to establish." Though unreviewed, Palmeri has been followed by several district courts throughout the country. But we disagree with the holding in Palmeri because the duty to disclose is assumed by saying that if the final naturalization hearing had been postponed for some reason and Palmeri was convicted then "the petition ultimately would have been denied on the ground that during all of the periods referred to in * * * [the statute] * * * [Palmeri] had failed to prove that he has 'been and still is a person of good moral character, attached to the principles of the Constitution * * * and well disposed to the good order and happiness of the United States', as evidenced by his conviction." Id., at page 227. In Palmeri, the trial judge assumed the arrest (and subsequent conviction) would have barred naturalization because such facts indicated want of good moral character, and by making that assumption part of his premise he reasoned to the conclusion that there was a duty to disclose a fact which would have prevented naturalization. We think the government is aware of that point, for in Minerich's case plaintiff points up two elements: (1) was there a duty on Minerich to disclose his arrests to the naturalization court? and, (2) did the failure so to do equate to "bad moral character?" If such a duty exists it must come from case law or elsewhere for we have found nothing by way of a statutory provision, effective prior to or in 1928, commanding voluntary disclosure during the interim period following the last examination and the final hearing at which the oath of citizenship is administered. This case is unlike United States v. De Francis, 1931, 60 App.D.C. 207, 50 F.2d 497, 498, cited to us by the government, where at the naturalization hearing "the judge asked the question whether there was proof of conviction of the sale of intoxicating liquor" and "Appellee was the only one present who knew that he had been convicted, and he stood mute." The record before us is devoid of any facts surrounding the admission [8] proceedings in Pennsylvania and for that matter we are simply given the fact of arrest and the fact of naturalization from which to infer there was a duty to disclose which was breached. We would go much too far if, on the state of the record, we now postulate such a duty for the year 1928. To be sure there is a tempting implication dangled before us, but the yardstick of proof, already delineated above, precludes our capitulation. See e. g. Cufari v. United States, 1 Cir., 1954, 217 F.2d 404. Only by reading back into the antecedents of Minerich's behavior certain characteristics that belong to its consequences could it now be said the duty of disclosure existed during the seventeen day period culminating in the oath of citizenship.

" * * * (C)oncealment of a material fact or * * * willful misrepre-

---

7. By marginal note 2 to the opinion reported as United States v. Kessler, 3 Cir., 1953, 213 F.2d 53, 55, Chief Judge Biggs stated: "A question about the arrest record of an applicant for citizenship first appeared as question number 29 on a preliminary form for petition for citizenship on July 1, 1929."

8. § 4, Act of 1906, 34 Stat. 596, 598.

sentation" are the two statutory[9] alternative grounds authorizing revocation of an order admitting a person to citizenship. The question now arises on the words "concealment" and "material fact," undefined in the current piece of legislation. There is a delusive exactness about those quoted words and their application here is heightened by the Congressional shift from the terms fraud and illegal procurement earlier laid down as the statutory basis for revocation. There are, of course, declarations and petitions filed by aliens in various stages of the naturalization process and without doubt such written documents were uppermost in the mind of the Congress when § 340(a) was drafted. Providing for revocation when the certificate of naturalization is "illegally procured" or obtained through "fraud" present broader grounds than do either of the § 340 alternatives. Silence at the time of naturalization is the basis here for seeking forfeiture of Minerich's citizenship. There is no evidence, whatever, that he did anything to prevent inquiry, or to elude investigation, mislead or hinder the officials charged with duties under the naturalization Act. Combining Minerich's membership in the Communist Party, U. S. A., and his activities in that connection, together with his arrests and the conviction does not aid in solving the critical question stemming from his non-disclosure unless we find he had a duty to disclose. Section 9 of the Act of 1906 provided: "That every final hearing upon such [naturalization] shall be had in open court before a judge * * *." 34 Stat. 599; 8 U.S.C.A. § 398.* But in a marginal note on page 791 of Laws Applicable to Immigration And Nationality published by the Department of Justice (1953) we find: "The provisions of this section (9) requiring the examination of the petition-er and witnesses under oath and in the presence of the court in general did not apply in any case where a designated naturalization examiner or officer conducted the preliminary hearing under the fourteenth subdivision of sec. 4, Act of June 29, 1906 (44 Stat. 709)." That is virtually a description of the procedures shown by the evidence in the record before us.

At the time of Minerich's naturalization hearing the fourth subsection in § 4 of the 1906 Act** provided:

"It shall be made to appear to the *satisfaction* of the *court admitting* any alien to citizenship that *immediately preceding the date of his application* he resided continuously within the United States five years at least, and within the State or Territory where such court is at the time held one year at least, and *that during that time* he has *behaved as a man of good moral character,* attached to the *principles of the Constitution of the United States,* and *well disposed to the good order* and happiness of the same. * * * *"* (Italics supplied).

We think it clear that under § 4 the court looked to examiners of the Service for information regarding applicants rather than the individual petitioner because of the fourteenth subdivision added to § 4, supra by the Act of June 8, 1926 (44 Stat. 709–710):†

"Fourteenth. (a) The judge of any United States district court, or the senior judge of such court if there are more judges than one, is hereby authorized, in his discretion, to designate one or more examiners or officers of the Immigration and Naturalization Service serving as such examiner or officer within the

---

**9.** § 340(a), Immigration and Nationality Act of 1952, Section 338(a) of the Act of 1940 provided for canceling certificates of naturalization "on the ground of fraud or on the ground that such order and certificate of naturalization were illegally procured." 54 Stat. 1137, 1159.

* Now 8 U.S.C.A. § 1447(a).

** Now 8 U.S.C.A. § 1427(a).

† Now 8 U.S.C.A. § 1446.

**732**

territorial jurisdiction of such court, *to conduct preliminary hearings upon petitions for naturalization to such court,* and to make findings and recommendations thereon. For such purposes any such designated examiner or officer is hereby authorized to take testimony concerning any matter touching *or in any way affecting the admissibility of any petitioner for naturalization,* to subpoena witnesses, and to administer oaths, including the oath of the petitioner to his petition and the oath of his witnesses."

Throckmorton and Ilderton [10] were the examiners who filled in plaintiff's Exhibit 1 (Examiner's slip) as part of the "preliminary hearing" held December 9, 1927 during which they interviewed Minerich. From their testimony we are satisfied that the examiners conducted this hearing in connection with, and by use of the petition for admission to citizenship; when the examiners reported to the court no further official action was taken between December 9, 1927 and March 19, 1928. From all we can find in this record the judge relied on the examiners' report and not upon the petitioner. In this state of the record we refrain from creating a duty to disclose after the Throckmorton-Ilderton hearing. There is, of course, evidence of Minerich's communist membership sometime during 1925 (the evidence is stronger beginning in 1926) to 1928 and through subsequent years, but we have been unable to discover "clear, unequivocal and convincing evidence" that either examiner asked Minerich if he was a communist; though they did ask him if he was an anarchist and his reply was in the negative. If "anarchist" [11]

10. Testifying below, Examiner Ilderton stated:

"Q. Mr. Ilderton, subsequent to the time of the interview with the applicant, Mr. Minerich, if you had determined that the defendant, or the applicant had been arrested on any occasion subsequent to the time of your interview with him, what, if anything, would you have done? A. First, I would have had his name removed from the list of those to be admitted to citizenship.

"Q. Why? A. In order to have an opportunity to investigate the arrest."

"By the Witness: A. Well, of course, if—I would have investigated the arrest, and if the crime involved was of sufficient importance, very likely the petition would then be opposed in court—that is admission to citizenship.

"By Mr. Bickley: Q. Now, you say if the crime involved had been of sufficient importance. What do you mean by that? A. Well, I would eliminate traffic violations and minor violations and ascertain whether or not it was a serious crime.

"Q. But you would conduct an investigation? A. Oh, yes.

"Q. And do I understand that you testified that you would have held up the man becoming a citizen, or at least taking of the oath, is that correct? A. Oh, yes, he would have been stricken from the list of those to be admitted.

"Q. Would you have changed your recommendation from "Grant" that you wrote on your Examiner's brief? A. Yes, I would have asked—at that time I would have asked that the hearing on the petition be continued for an investigation.

"Q. One other question, sir. You stated you accompanied the applicant to open court. If the applicant in open court had stated he had been arrested, would you have made a *notation* anywhere? A. I would have made a notation.

"Q. Would you have requested his name be withdrawn at that time so as investigation could have been *conducted?* A. I would have.

"Q. Do these records which you have been examined on show any such notation? A. No, there is no notation of that nature on this brief or any other record."

11. For a definition of "anarchist" see Turner v. Williams, 1904, 194 U.S. 279, 293, 24 S.Ct. 719, 48 L.Ed. 979.

Speaking of Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, in the Report of the Commission On Government Security (1957) it was said at page 547: " * * * the applicable statute did not provide adherence to Communist beliefs was incompatible with attachment to principles of the Constitution." Schneiderman was naturalized in 1927.

included "communist" in 1928 then Minerich concealed or misrepresented his true position, but the uncertainties inherent in this record override the implications that Minerich was an anarchist either by avowal or actuality.

During the course of his separate concurring opinion in Dennis v. United States, 1941, 341 U.S. 494, 563, 564, 565, 569, 71 S.Ct. 857, 894, 895, 95 L.Ed. 1137, Mr. Justice Jackson underscored several points that are relevant to our problem: "Communism, the antithesis of anarchism, appears today as a closed system of thought representing Stalin's version of Lenin's version of Marxism * * *. The Communists have no scruples against sabotage, terrorism, assassination, or mob disorder; but violence is not with them, as with the anarchists, an end in itself. * * * Force would be utilized by the Communist Party not to destroy government but for its capture." Elsewhere in his opinion the Justice acutely observed: " * * * Either by accident or design, the Communist strategem outwits the anti-anarchist pattern of the statute aimed against 'overthrow by force and violence' if qualified by the doctrine that only 'clear and present danger' of accomplishing that result will sustain the prosecution." See also Yates v. United States, 1957, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed. 2d 1356.

Today, we must avoid viewing with hostile spirit the silence of Minerich in 1928. Though communism is now recognized as an enemy ideology, contemporary recognition finally became crystallized in official circles of our government at a comparatively late date.[12] This is not criticism, but history and "a page of history is worth a volume of logic," wrote Mr. Justice Holmes in New York Trust Co. v. Eisner, 1921, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963. To presently approve Minerich's forfeiture of citizenship would be saying that he ought to be blamed for having remained silent because of what is currently acknowledged about the communist threat.

12. "Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, overruled earlier holdings that the court could take judicial notice that the Communist Party does advocate overthrow of the Government by force and violence. This Court reviewed much of the basic Communist literature that is before us now, and held that it was within 'the area of allowable thought,' id., 320 U.S. at page 139, 63 S.Ct. at page 1343, 87 L.Ed. 1796, that it does not show lack of attachment to the Constitution, and that success of the Communist Party would not necessarily mean the end of representative government. The Court declared further that 'A tenable conclusion from the foregoing is that the Party in 1927 desired to achieve its purpose by peaceful and democratic means, and as a theoretical matter justified the use of force and violence only as a method of preventing an attempted forcible counter-overthrow once the Party had obtained control in a peaceful manner, or as a method of last resort to enforce the majority will if at some indefinite future time because of peculiar circumstances constitutional or peaceful channels were no longer open.' Id., 320 U.S. at [page] 157, 63 S.Ct. at page 1352, 87 L.Ed. 1796. Moreover, the Court considered that this 'mere doctrinal justification or prediction of the use of force under hypothetical conditions at some indefinite future time—prediction that is not calculated or intended to be presently acted upon, * * *,' ibid., was within the realm of free speech. A dissent by Mr. Chief Justice Stone, for himself and Justices Roberts and Frankfurter, challenged these naive conclusions, as they did again in Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103, in which the Court again set aside an Attorney General's deportation order. Here Mr. Justice Murphy, without whom there would not have been a majority for the decision, speaking for himself in a concurring opinion, pronounced the whole deportation statute unconstitutional, as applied to Communists, under the 'clear and present danger test', because, 'Not the slightest evidence was introduced to show that either Bridges or the Communist Party seriously and imminently threatens to uproot the Government by force or violence.' 326 U.S. at page 165, 65 S.Ct. at page 1457, 89 L.Ed. 2103." From marginal note 12 in the concurring opinion of Mr. Justice Jackson in Dennis v. United States, 1951, 341 U.S. 494, 569, 71 S.Ct. 857, 897, 95 L.Ed. 1137.

Regardless of what government witnesses Malkin, Note, Gitlow and Wright described from the witness stand as the communist objective [13] during 1925 to 1928, Congressional disapproval of affiliation with that party remained legislatively inarticulate until recent years and, the record before us is silent on the point. But all we mean is that there is no legalistic way, this late in the day, by which we can fairly decide if there was such concealment by Minerich in 1928 warranting 1957 revocation of his citizenship. This is an attack on an equity decree. A political decision, here, based on hindsight would infect the judicial processes of our free society faster than tolerating retention of a probably undeserved privilege of citizenship by Minerich, who manifests persistent adherence to the communist party. Our decision on this appeal has no bearing whatever on his activities after he became a citizen.

■ Settling the constitutionality of § 340(a) is indispensable [14] for disposition of this case and for that reason we reach the respondent's challenge of that provision. But we think § 340(a) survives respondent's constitutional attack. Knauer v. United States, 1946, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500; Luria v. United States, 1913, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101; Johannessen v. United States, 1912, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066. The decree of denaturalization brought here for review is reversed.

Reversed.

13. Following here are the various materials introduced in evidence during the Minerich denaturalization proceedings:

Marx and Engels, Manifesto of the Communist Party (8th printing 1937—International Pub. N. Y.); Lenin, State And Revolution, (4th printing 1935 Internat. Pub., 381 Fourth Ave., N. Y.); Stalin, Problems of Leninism (2nd printing, 1935); Program Of The Communist International Together With Its Constitution (Worker's Library Pub. 1936); J. Peters, The Communist Party—A Manual On Organization (Worker's Library Pub., 1935); The Struggle Against Imperialist War and the Tasks of the Communists—Resolution of the VI World Congress Of The Communist International, July—August, 1928 (Worker's Library Pub. 1932); Two copies—different editions of Olgin, Why Communism? (Worker's Lib. Pub. 1933 and 1934); Questions and Notes on "The A. B. C. of Communism" For Study Class Use; Bittelman, 15 Years Of The Communist Party (Worker's Library Pub. 1934); Lenin, "Left-Wing" Communism, And Infantile Disorder (Intern. Pub. 1940); Piatnitsky, The Twenty-One Conditions of Admission Into The Communist International.

Several of these booklets show earlier copyright and publication dates, but we have reported the latest date. Those items bearing dates after 1928 have dubious relevancy here.

14. Sec. 340(i) "The provisions of this section shall apply not only to any naturalization granted and to certificates of naturalization and citizenship issued under the provisions of this title, but to any naturalization heretofore granted by any court, and to all certificates of naturalization and citizenship which may have been issued heretofore by any court or by the Commissioner based upon naturalization granted by any court, or by a designated representative of the Commissioner under the provisions of section 702 of the Nationality Act of 1940, as amended, or by such designated representative under any other act."